**WESTERN PIONEER, INC., a Washington Corporation, Appellant,**

v.

**HARBOR ENTERPRISES, INC., Appellee.**

No. S–3967.

Supreme Court of Alaska.

Oct. 11, 1991.

Jeffrey M. Feldman, Young, Sanders & Feldman, Anchorage, for appellant.

Robert C. Erwin, Erwin & Smith, Anchorage, for appellee.

Before RABINOWITZ, C.J., and MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

MOORE, Justice.

This appeal arises from an action filed by Western Pioneer, Inc. (Western Pioneer) against Harbor Enterprises, Inc. (Harbor Enterprises) to enforce payment provisions of a lease agreement. Western Pioneer moved for summary judgment, claiming that the payment provisions require Harbor Enterprises to pay it a percentage of all fuel sales from certain property in Dutch Harbor, including sales from a dock owned by the City of Unalaska. Harbor Enter-

prises cross-moved, claiming that it had no obligation under the lease because a condition precedent to its duty was never satisfied. The superior court denied both summary judgment motions. The matter was tried to a jury which found in favor of Harbor Enterprises. Western Pioneer appeals, claiming that the superior court erred in denying its motion for summary judgment. We reverse.

## I. Factual and Procedural History

In early 1984, Harbor Enterprises entered into negotiations with Sea–Alaska Products, Inc. (Sea–Alaska) to lease a parcel of land owned by Sea–Alaska at Dutch Harbor, Alaska. The lease was negotiated by Dale Lindsey, owner of Harbor Enterprises, and William Woods, vice-president of Sea–Alaska. Harbor Enterprises sought the property to establish operation of two fuel terminals from which to sell fuel and supplies to fishing boats. One terminal was to be located on the leased premises (the Sea–Alaska Dock); the other on property which Harbor Enterprises was to lease from the City of Unalaska (the City Dock). Harbor Enterprises planned to construct a warehouse and fuel tank farm on the property leased from Sea–Alaska and to run pipelines from the tank farm to both the Sea–Alaska Dock (the Sea–Alaska Pipeline) and the City Dock (the Harbor–City Dock Pipeline).

In the summer of 1984, Harbor Enterprises entered into negotiations with the City of Unalaska (Unalaska) to sell fuel from the City Dock. As a result of these negotiations, Unalaska passed resolutions authorizing Harbor Enterprises to construct the Harbor–City Dock Pipeline. On September 13, 1984, Harbor Enterprises and Sea–Alaska executed their lease agreement. By early 1985, Harbor Enterprises had constructed the warehouse, fuel farm, and the Sea–Alaska Pipeline. The Harbor–City Dock Pipeline, however, was never constructed.

On November 10, 1986, Sea–Alaska sold the Dutch Harbor property to a competitor of Harbor Enterprises, Appellant Western Pioneer. As part of this sale, Sea–Alaska assigned to Western Pioneer its rights under the lease with Harbor Enterprises.

In 1987, Harbor Enterprises entered into an agreement with Unalaska to lease land located near the City Dock. On this land, Harbor Enterprises constructed a second tank farm and a pipeline from the second farm to the City Dock. Harbor Enterprises sells fuel from this facility at the City Dock.

Western Pioneer then notified Harbor Enterprises that it was not submitting full royalty payments for its City Dock fuel sales as required by Section 3.1 of the lease. Harbor Enterprises responded that it is not required to make the royalty payments. On December 9, 1987, Western Pioneer notified Harbor Enterprises that it was in breach of the lease agreement.

On January 19, 1988, Western Pioneer filed this action seeking possession of the leased property as well as payment of unpaid rent and utilities relating to Harbor Enterprises' sale of fuel from the City Dock. Harbor Enterprises counterclaimed that Western Pioneer interfered with its quiet enjoyment of the leased premises.

Both Western Pioneer and Harbor Enterprises filed motions for summary judgment. Western Pioneer argued that under Section 3.1 of the lease, Harbor Enterprises' royalty payment obligation was clear and unambiguous, requiring payment for all fuel sales including those from the City Dock pursuant to Harbor Enterprises' agreement with Unalaska. Harbor Enterprises argued that it intended its City Dock royalty payment obligation to be conditioned upon its construction of the Harbor–City Dock Pipeline. Harbor Enterprises asserted that Section 3.1 did not apply to its City Dock fuel sales because the pipeline was never constructed.[1]

After oral argument, the superior court denied both motions. Construing the lease

1. Harbor Enterprises further argued that it was not obligated to make the royalty payments because the fuel sold from the City Dock was stored at and delivered from the fuel tank farm on the land Harbor Enterprises leased from Unalaska.

in light of *Alaska Diversified Contractors v. Lower Kuskokwim School Dist.*, 778 P.2d 581, 583–84 (Alaska 1989), *cert. denied*, 493 U.S. 1022, 110 S.Ct. 725, 107 L.Ed.2d 744 (1990), the court found that: (1) the lease agreement was integrated; (2) there was conflicting extrinsic evidence concerning whether Section 3.1 was intended to include City Dock fuel sales; and (3) the meaning of the lease was a question for the jury because Section 3.1, when read in context with the other provisions, was susceptible to two reasonable but differing interpretations.[2] The case was tried to a jury, which found in favor of Harbor Enterprises.

## II. Discussion

Western Pioneer claims that the superior court erred in denying its motion for summary judgment. Western Pioneer argues that the language of Section 3.1 is clear and unambiguous and that the superior court erred in concluding it was "reasonably susceptible" to different meanings. Harbor Enterprises argues that the trial court correctly applied *Lower Kuskokwim* in determining that Section 3.1, when read in context with the other provisions of the lease, was susceptible to different meanings.

The central question thus is whether Harbor Enterprises is obligated under Section 3.1 of the lease to pay royalties to Western Pioneer for its City Dock fuel sales.[3]

■ In interpreting a contract, the court's duty is to ascertain and give effect to the reasonable intentions of the contracting parties. *Fairbanks North Star Borough v. Tundra Tours, Inc.*, 719 P.2d 1020, 1024 (Alaska 1986); *Norton v. Herron*, 677 P.2d 877, 879–80 (Alaska 1984). The par-

ties' reasonable expectations are assessed through resort to the language of the disputed provision and other provisions, relevant extrinsic evidence, and case law interpreting similar provisions. *Peterson v. Wirum*, 625 P.2d 866, 872 n. 10 (Alaska 1981).

We turn first to Section 3.1 of the lease which provides:

> *Base Rent.* Lessee shall pay to Lessor as Base Rent for the Premises and its right to the limited use of the other docks located at the Dutch Harbor Property an amount equal to:
>
> (i) 1.2 cents per gallon for every gallon of bulk fuel sold in, upon and/or from the Premises, any of the docks located at the Dutch Harbor Property, *or the City Dock*, as defined below;
>
> (ii) plus 1.5% of the gross sales price of all packaged goods and other petroleum and fuel products sold in, upon and/or from the Premises, any of the docks located at the Dutch Harbor Property, or the *City Dock*, as defined below;
>
> (iii) less a discount of .6 cents per gallon for each gallon of bulk fuel sold from the dock owned by the city of Unalaska, located in Dutch Harbor (the "City Dock"); provided, however, that said discount shall be limited to ten percent (10%) of the total gallons of bulk fuel sold from the Premises *and/or the City Dock* . . . .

(Emphasis added). This language clearly states that Harbor Enterprises is required to pay Western Pioneer 1.2 cents per gallon, less a 0.6 cents per gallon discount, for each gallon of bulk fuel sold from the City Dock. Reviewing the other lease provisions, we find that none of them mentions or contemplates the Harbor–City Dock Pipeline or that Harbor Enterprises' rental payment obligation is in any way conditioned on its construction.

---

**2.** The court noted that the lease recitals addressed the parties' rights and interests with respect only to the leased premises, making no reference to the City Dock, while Section 3.1 indicated the lease also was intended to include fuel sales from the City Dock.

**3.** The applicable standard of review in a case involving an appeal from a denial of summary judgment is *de novo*. *Smith v. Krebs,* 768 P.2d 124, 125 n. 4 (Alaska 1989). The trial court's

denial of summary judgment will be affirmed if there is a genuine issue of material fact or it is clear that the moving party was not entitled to judgment as a matter of law. *Id.* The burden is on the moving party to show that there is no genuine issue as to any material fact. *Id.* The court is required to draw all reasonable inferences in favor of the non-moving party and against the movant. *Id.*

We next look to relevant extrinsic evidence. In support of its position, Western Pioneer offers the deposition testimony of Woods and the affidavit of Ronald Jensen, president of Sea–Alaska at the time the lease was negotiated. In his deposition, Woods states that during the parties' negotiations, it was clear that Section 3.1 was intended to cover any sale of fuel from the City Dock. Jensen indicates in his affidavit that the lease was written to include all City Dock fuel sales regardless of whether the Harbor–City Dock Pipeline was built.

In support of its position, Harbor Enterprises points to Woods' deposition where he states that: (1) during the lease negotiations, Lindsey said he intended to construct the Harbor–City Dock Pipeline, and (2) the pipeline was the only means by which the parties ever discussed delivering the fuel to the City Dock. Harbor Enterprises points to Lindsey's deposition where he states that the rental provisions of Section 3.1 were conditioned upon Harbor Enterprises constructing the Harbor–City Dock Pipeline.

█ The superior court found this evidence to be conflicting and proceeded to interpret the lease in light of the parol evidence rule as set forth in *Lower Kuskokwim*.[4] The court ruled that the testimony of Lindsey and Woods supported Harbor Enterprises' contention that its obligation under Section 3.1 for City Dock fuel sales was conditioned on it constructing the Harbor–City Dock Pipeline, while Jensen's affidavit indicated that Section 3.1 was intended to include all City Dock fuel sales regardless of how the fuel reached the dock.

█ In our opinion, Lindsey's testimony reflects only a restatement of his position in this litigation to which little, if any, weight should be given. Extrinsic evidence of parties' subjective intent, expressed during the course of litigation, does not establish an issue of fact regarding the parties' reasonable expectations. *Peterson*, 625 P.2d at 870; *see also Day v. A & G Constr. Co.*, 528 P.2d 440, 444 (Alaska 1974) (rejecting subjective intent as a standard for contract interpretation because evidence of subjective intentions or understandings normally accomplish no more than a restatement of the parties' conflicting positions). Although Jensen is no longer employed by Western Pioneer, a similar argument may be made that his testimony reflects only a restatement of his former employer's position in this case and therefore should be discounted.

---

4. The parol evidence rule is implicated when one party seeks to introduce extrinsic evidence which varies or contradicts an integrated contract. *Alaska Diversified Contractors, Inc. v. Lower Kuskokwim School District*, 778 P.2d 581, 583 (Alaska 1989), *cert. denied*, 493 U.S. 1022, 110 S.Ct. 725 (1990). Once the rule is triggered, the parties' reasonable expectations are determined by applying a three-step test. *Id.* at 583–84; *Alaska Northern Dev., Inc. v. Alyeska Pipeline Serv. Co.*, 666 P.2d at 33, 37–40 (Alaska 1983), *cert. denied*, 464 U.S. 1041, 104 S.Ct. 706, 79 L.Ed.2d 170 (1984). The first step is to determine whether the contract is integrated. *Alaska Diversified*, 778 P.2d at 583. The second step is to determine what the contract means. *Id.* Determining the meaning of a contract is treated as a question of law for the court except where there is conflicting extrinsic evidence on which resolution of the contract's meaning depends. *Id.* at 584; *Alyeska Pipeline Serv. Co. v. O'Kelley*, 645 P.2d 767, 771 n. 2 (Alaska 1982). Whether there is conflicting extrinsic evidence is a question resolved by the court. *Alaska Diversified*, 778 P.2d at 584. Even where there is conflicting extrinsic evidence the court decides the question of meaning except where the written language, when read in context with its subject matter, is reasonably susceptible to both asserted meanings. *Id.* If the language is susceptible to both asserted meanings, then interpreting the contract is a question of fact for the jury. *Id.* Extrinsic evidence may always be received in resolving these first two inquiries. *Id.* at 583–84; *O'Kelley*, 645 P.2d at 771 n. 1. The third step is to determine whether the prior agreement conflicts with the integrated writing. *Alaska Diversified*, 778 P.2d at 583; *Alaska Northern*, 666 P.2d at 39–40. Whether there is conflicting extrinsic evidence depends on whether the prior agreement is inconsistent with the integration. *Alaska Northern*, 666 P.2d at 39–40. Inconsistency is defined as "the absence of reasonable harmony in terms of the language and respective obligations of the parties." *Id.* at 40. In *Alaska Northern* we adopted, for purposes of section 2–202(b) of the Uniform Commercial Code, the view of "inconsistency" set forth in *Snyder v. Herbert Greenbaum & Associates, Inc.*, 38 Md.App. 144, 380 A.2d 618 (1977). While extrinsic evidence is important, nonetheless after the transaction has been shown in all its length and breadth, the words of an integrated agreement remain the most important evidence of intention. *Alaska Diversified*, 778 P.2d at 584.

**658**

The only remaining relevant evidence comes from Woods. We interpret this evidence as furthering Western Pioneer's contention that Section 3.1 of the lease was meant to include all fuel sales from the City Dock. That Woods' testimony indicates that the parties knew of or contemplated Harbor Enterprises' desire to construct the Harbor–City Dock Pipeline is a far cry from an express manifestation that the pipeline was a condition precedent to the enforcement of Section 3.1. Further, we are reluctant to infer such a condition in view of our general disapproval of conditions precedent.[5]

The superior court erred in finding there to be conflicting extrinsic evidence which, in turn, caused it to erroneously construe the lease in light of the parol evidence rule. This is not a parol evidence rule case but one which may be resolved by applying general principles of contract interpretation. As such, we construe the lease to mean that Section 3.1 was intended by the parties to include all fuel sales made by Harbor Enterprises at the City Dock regardless of whether the Harbor–City Dock Pipeline was constructed. *Fairbanks North Star,* 719 P.2d at 1024; *Peterson,* 625 P.2d at 872 n. 10.

We find that there are otherwise no remaining issues of material fact and that Western Pioneer is entitled to judgment as a matter of law. *Smith v. Krebs,* 768 P.2d 124, 125 n. 4 (Alaska 1989); *Grand v. Municipality of Anchorage,* 753 P.2d 141, 143 n. 3 (Alaska 1988).[6] The superior court erred in denying Western Pioneer's motion for summary judgment.

REVERSED.

BURKE, J., not participating.

---

**5.** *See Kennedy Assoc., Inc. v. Fischer,* 667 P.2d 174, 182 n. 9 (Alaska 1983); *Peterson,* 625 P.2d at 873–84.

**6.** Harbor Enterprises also argues that, under Civil Rule 61, the superior court's error in denying Western Pioneer's summary judgment motion is harmless in view of the final determination of the jury and the ultimate decision of the trial court. Although a novel argument, the superior court's error was central in submitting a case to a jury which was more appropriately resolved as a matter of law by the court.