NEAL & COMPANY, INC., an Alaska corporation, Appellant,

v.

The ASSOCIATION OF VILLAGE COUNCIL PRESIDENTS REGIONAL HOUSING AUTHORITY, Appellee.

No. S–6123.

Supreme Court of Alaska.

May 19, 1995.

---

498

R.R. De Young, Wade & De Young, Anchorage, for appellant.

Gregory A. Miller and Steve Hutchings, Birch, Horton, Bittner & Cherot, Anchorage, for appellee.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

## OPINION

MOORE, Chief Justice.

## I. INTRODUCTION

Neal & Company (Neal) contracted with the Association of Village Council Presidents Regional Housing Authority (the Housing Authority) to construct eighty-three single-family homes in the vicinity of Bethel. The parties dispute whether the Housing Authority was obligated to supply the sites with a source of permanent electricity for Neal's use during construction.

Neal appeals from a grant of partial summary judgment in favor of the Housing Authority. Neal further appeals the denial of a motion for reconsideration and an order preventing Neal from introducing evidence at

trial pertaining to the electricity issue. We affirm.

## II. FACTS AND PROCEEDINGS

The Housing Authority is a public corporation that facilitates the construction of housing for Native Alaskans in rural areas of the state. The organization is funded primarily by the United States Department of Housing and Urban Development (HUD). In March 1988, the Housing Authority invited potential bidders to respond to a standard-form HUD contract offering with specifications for the construction of eighty-three single-family homes in the villages of Napakiak, Mekoryuk, Napaskiak, Pitkas Point, and Oscarville.

Neal was the low bidder among six general contractors that submitted proposals. The Housing Authority awarded Neal the contract and directed Neal to begin construction on June 1, 1988. The contract set completion dates of May 25, 1989, for Mekoryuk and Pitkas Point, and September 2, 1989, for the remaining three villages. Soon after Neal was awarded the contract, Neal notified the Housing Authority that it planned to substantially complete construction of all housing units early, by December 1988.

With the exception of Oscarville, the construction sites had not been equipped with permanent electric utility service at the time Neal was awarded the contract.[1] Neal contends that the Housing Authority was required to equip the sites with a source of permanent electricity for Neal to use during construction. The Housing Authority denies this, maintaining that although it possessed a duty to arrange permanent electric service for future homeowners, the bid documents clearly state that Neal was to supply whatever power it would require during the construction process.

Before contract negotiations were finalized, Neal sought information concerning what power sources would be available at the sites. While Neal was preparing its bid for the housing project, Chris Oehler, Neal's

---

1. Housing Authority Executive Director John Guinn affied that permanent electrical power was present at four sites within a distance of 200 to 800 feet. Nevertheless, only one of the five construction sites was directly outfitted with a source of permanent electricity which could support Neal's power requirements.

project manager, orally inquired of two employees of the project architect regarding the status of permanent electricity service at the construction sites.[2] Oehler later affied that Roger Sieber had informed him that "all necessary arrangements had been made by [the Housing Authority] to assure that permanent electric utility service would be available for use by the contractor during construction on the project." He also affied that Paul Whipple had told him that the Housing Authority was "attempting to complete negotiations with the serving utilities so that permanent electric utility service could be constructed during the summer of 1988."

Despite these representations and the fact that HUD had requested that formal executed agreements with the local utilities be in place before the main construction contract was awarded, the Housing Authority did not complete its discussions with the utilities before it awarded the contract to Neal.

With the exception of one village which was fully equipped with permanent power when Neal required it, Neal completed construction before permanent power lines were extended to the new subdivisions.[3] To satisfy its power requirements during construction, Neal relied on temporary generators. Final acceptance of the housing units was also delayed because mechanical equipment installed in the homes could not be formally inspected without the presence of permanent power.

In October 1990 Neal submitted a written request to the Housing Authority for an equitable adjustment of the final contract price.[4] In its demand for additional compensation, Neal claimed that the Housing Authority's failure to supply permanent electrical power for use during construction resulted in delays and additional costs. The Contracting Officer denied Neal's claim, stating that the Housing Authority was under no contractual duty to supply Neal with electrical power.

Neal pursued its equitable adjustment claim against the Housing Authority in Bethel Superior Court. Among other contract claims, Neal contended that it "suffered substantial construction delays and extra costs as a result of [the Housing Authority's] failure to timely bring permanent electrical power to the construction sites." The Housing Authority denied that it was responsible for supplying permanent power for Neal's use. The parties cross-moved for partial summary judgment on this issue.

In a memorandum decision the superior court granted the Housing Authority's Motion for Partial Summary Judgment. After examining the entire contract, Judge Curda concluded: "The Court sees no evidence, in reviewing the contract, standing alone, which indicates that [the Housing Authority] had a duty to supply permanent power for use by Neal during construction." The court went on to consider the extrinsic evidence offered by Neal, especially pre-bid representations made by the architect which Neal argued led it to expect that permanent power would be available for its use during construction. The court explained that under the facts of the case, debate over the meaning of the contract was a question for the court: "The language of the contract, standing by itself, and in light of the extrinsic evidence provided to this Court, is not reasonably susceptible to both asserted meanings, but only one." The court determined that because the contract was integrated, and because the extrinsic evidence "directly contradicts the contract as interpreted by [the] Court," Oehler's testimony constituted inadmissible parol evidence.

Neal unsuccessfully moved the court for reconsideration. Alaska R.Civ.P. 77(k). The

---

**2.** The inquiries were made specifically to employees of Kowchee, Inc., the project architect, which possessed the authority to act as a conduit for dialogue between the Housing Authority and the contractor.

**3.** Permanent electrical service arrived at the unequipped sites on the following dates:

| Mekoryuk | December 16, 1988 |
| Napakiak | December 18, 1988 |
| Napaskiak | April 1, 1989 |
| Pitkas Point | April 20, 1989 |

**4.** The standard-form HUD contract allows the contractor to request an equitable adjustment to compensate for site conditions that "differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract."

trial court further ruled that based upon the court's decision granting the Housing Authority partial summary judgment, Neal would not be permitted to present additional evidence at trial on the electricity issue. The court explained that "[b]ased on the Court's knocking out that cause of action, hearing evidence on that is not relevant."

On the eve of trial, the parties settled all remaining claims, with Neal preserving the right to appeal from partial summary judgment on the electricity issue. Neal now appeals.

## III. *DISCUSSION*

### A. *Duty to Supply a Source of Permanent Electricity For Construction Purposes*

Neal bases its contention that the Housing Authority was obligated to supply the construction sites with a source of permanent electric power on three primary grounds. First, Neal argues that the language of the contract, taken as a whole, implies that the Housing Authority had a duty to timely supply permanent power to the sites for construction purposes. Neal emphasizes certain contract provisions which direct Neal to "[a]scertain where these services *will be available* "[5] and require Neal to ensure that "the electrical equipment provided will operate with *the site electrical system*."[6] (Emphasis added.)

Second, Neal contends that the architect's representations that permanent power "would be available" for Neal's use during construction reinforced the contractor's interpretation of the agreement's express terms. Because this extrinsic evidence does not vary or contradict the terms of the contract as interpreted by Neal, Neal contends that the parol evidence rule is inapplicable.

Finally, Neal argues that at a minimum, it was a third-party beneficiary of the Housing Authority's underlying contract with HUD. Neal notes that the Housing Authority was required to equip the new subdivisions with permanent electric power for the benefit of future homeowners, and emphasizes that HUD had specifically requested that the Housing Authority finalize its agreements with the local utilities before awarding the construction contract to Neal.

The Housing Authority rejects Neal's assertions that it was responsible for erecting a source of permanent power in time for Neal to use during construction. The Housing Authority contends that with regard to electrical power, the contract was reasonably susceptible to only one meaning. Central to the Housing Authority's argument are two express provisions which required Neal to "furnish all ... power ... necessary for performance of the work."[7]

The Housing Authority also identifies contract language which, in its view, explicitly allocated to Neal the risk that a source of permanent power would not be immediately available. In the "Conditions Affecting the Work" clause, for example, Neal represented that it had "satisfied itself as to the general and local conditions which can affect the work or its cost." The provision further specified:

> Any failure of the Contractor to take the actions described and acknowledged in this paragraph will not relieve the Contractor from responsibility for estimating properly the difficulty and cost of successfully per-

---

**5.** The relevant portion of the "Temporary Facilities and Controls" section provided:

1. *Temporary Utilities: Water and electricity for construction shall be the responsibility of and shall be paid by the Contractor. Ascertain where these services will be available,* make temporary connections as required and remove same upon completion of work.

2. Temporary Heat: Furnish temporary heat by methods approved by the Architect.... (Emphasis added.)

**6.** In the "Description of Systems" section, the contract stated: "The contractor shall be respon-

sible for verifying that the electrical equipment provided will operate with the site electrical system...."

**7.** The "Contractor[']s Responsibility for Work" clause stated: *"The Contractor shall furnish all necessary* labor, materials, tools, equipment, water, *light, heat, power,* transportation, and supervision *necessary for performance of the work* and shall properly protect it until acceptance by the [Housing Authority]." (Emphasis added.) *See also supra* note 5.

forming the work or for proceeding to successfully perform the work without additional expense to the [Housing Authority].

In addition to requiring Neal to investigate local conditions, the Housing Authority assumed no responsibility for interpretations other than those made in writing and incorporated into the contract.[8] The bid documents explained the proper procedure for obtaining a formal interpretation: questions shall be submitted in writing before the deadline for bidding, and written interpretations shall thereafter be circulated to each bidder and incorporated into the contract.

The Housing Authority maintains that although Neal acceded to these terms, the contractor did not adequately perform its due diligence inquiry. According to the Housing Authority, Neal failed to visit two of the five job sites or contact any of the local utility companies prior to bidding on the contract. Therefore, the Housing Authority argues that Neal's expectation that permanent power would be provided in time for use during construction was not objectively reasonable.

Finally, the Housing Authority contends that the lower court properly applied the parol evidence rule to bar evidence of pre-bid representations by the architect and correctly entered judgment in favor of the Housing Authority as a matter of law. In the Housing Authority's characterization, because the architect's representations flatly contradict the integrated contract, evidence of these conversations cannot be used to vary the terms of the agreement. The Housing Authority concludes that because Neal otherwise failed to identify any genuine issues of material fact, we should affirm summary judgment in the Housing Authority's favor.

■ The goal in interpreting any contract is to " 'give effect to the reasonable expectations of the parties.' " *Stepanov v.*

*Homer Elec. Ass'n,* 814 P.2d 731, 734 (Alaska 1991) (quoting *Mitford v. de Lasala,* 666 P.2d 1000, 1005 (Alaska 1983)). A grant of summary judgment based upon the interpretation of a contract is subject to de novo review. *Martech Constr. Co. v. Ogden Envtl. Servs.,* 852 P.2d 1146, 1149 (Alaska 1993). Summary judgment is inappropriate where the evidence before the trial court establishes that a genuine factual dispute exists as to the parties' intent. *Id.* The parties' expectations must be gleaned not only from the contract language, but also from extrinsic evidence, including the parties' conduct, goals sought to be accomplished, and surrounding circumstances at the time the contract was negotiated. *Peterson v. Wirum,* 625 P.2d 866, 870 & n. 7 (Alaska 1981).

### 1. The contract

■ The contract language, when read alone, does not support Neal's position. The detailed agreement explicitly stated in two separate passages that electrical power required for construction purposes was the sole responsibility of the contractor. On the first page of the standard-form HUD contract, in regular type, the agreement provided: "The Contractor shall furnish all ... light, heat, [and] power ... necessary for performance of the work...." In the specifications provided by the Housing Authority for the project, the contract again provided: "Water and electricity for construction shall be the responsibility of and shall be paid by the Contractor."

We find these clauses to be straight-forward. Nowhere in the contract document did the Housing Authority expressly promise that permanent power would be available for Neal's use. Where the agreement did address the contractor's need for electrical power, it used the broad phrases "[t]he Contractor shall furnish" and "the responsibility of ... the Contractor," thereby placing the responsibility on Neal to determine what

---

**8.** The "Conditions Affecting the Work" clause further provided:

> The [Housing Authority] assumes no responsibility for any conclusions or interpretations made by the Contractor based on the information made available by the [Housing Authority]. *Nor* does the [Housing Authority] assume

> responsibility for any understanding reached or *representation made concerning conditions which can affect the work* by any of its officers or agents before the execution of this contract, *unless that understanding or representation is expressly stated in the contract.*
> (Emphasis added.)

type of power source it would use during construction. It would be unreasonable to argue that the contractor's duty to "furnish" power simply requires it to *pay* for electricity used while hooked up to a pre-existing permanent power source. The second clause cited above clearly makes a distinction between the contractor's duty to *pay* for temporary utilities and its fundamental duty to procure those services for itself.[9]

An interpretation which allocates the duty to provide electrical power during construction solely to Neal is consistent with the remainder of the contract. At the initial stages of the procurement, upon review of the bid documents, it should have been clear to Neal that the installation of permanent electrical power at the remote sites could occur simultaneously with construction. There are at least two distinct passages in the agreement that required Neal to "coordinate all his work with the serving utilities (electrical, telephone, etc.)." Significantly, nowhere did the contract indicate that permanent electrical power would be established by a certain date.

In addition to the fact that the agreement was silent with regard to the date when permanent electrical power would ultimately be available, several provisions placed the risk upon the contractor that permanent power would not be established prior to or during construction. Neal agreed to investigate local conditions which could affect the cost of the work; this would include assessing the progress made at each site in setting up permanent power. The contract further specified that the Housing Authority would be responsible only for contract interpretations made in writing and incorporated into the contract; had Neal experienced any uncertainties after its investigation, it could have requested a formal interpretation.

Instead, Neal now identifies certain language in the contract which, in its view, implied that permanent electrical power would be established at the sites and available for Neal's use either at the outset of construction or before its completion. In referring to temporary utilities, for example, the contract stated: "Ascertain where these services *will be available*, make temporary connections as required and remove same upon completion of work." (Emphasis added.) Neal also emphasizes the contractual requirement that inspections were to utilize "the site electrical system." Neal contends that from this language, it formulated a reasonable expectation that the Housing Authority intended to set up permanent electrical power in time for Neal to use during construction.

In light of the provisions which placed the risk upon Neal that permanent power would not be available for construction use, Neal's interpretation misses the mark. The language requiring the contractor to "[a]scertain where these services *will be available*" should actually be read as a further directive to Neal to inquire into or "ascertain" the specific conditions at the five sites. As for the language which required inspections to utilize "the site electrical system," we agree with the analysis of the trial court. In light of the two provisions which placed responsibility for temporary power squarely on the contractor, *see supra* notes 5 and 7, the inspection term must be read narrowly: "If inspection cannot occur until permanent power is available, then [the Housing Authority] has a duty to promptly make power available *for inspection purposes.*" (Emphasis added.)

Finally, Neal draws our attention to some remaining language from the contract to support its position. Neal points out that the contract offered distinct warnings regarding a lack of certain services at the construction sites. For instance, the contract specifically cautioned that "[t]he Contractor should be aware of the lack of rooming and dining facilities in some villages." Neal infers that if the Housing Authority was under no duty to supply permanent power, the contract would have offered as specific a warning about the unavailability of electricity.

Neal's argument is not persuasive. In light of the two provisions discussed above which explicitly stated that the contractor

---

**9.** In addition, the contractor's responsibility to pay for utility connections or extensions is detailed separately in the contract.

was to be responsible for providing electric power for construction purposes, as well as the terms which placed the risk upon Neal that permanent power might not be available in time for the contractor's use, it is clear that Neal was adequately warned.

Based on the foregoing analysis, we can come to no other conclusion but that the language of the agreement clearly placed the burden upon potential bidders to investigate the availability of power at the outset and, if necessary, to make other arrangements to meet construction requirements. We therefore agree with the conclusion of the trial court that the contract provides "no evidence . . . standing alone, which indicates that [the Housing Authority] had a duty to supply permanent power for use by Neal during construction."

### 2. *Extrinsic evidence*

■ With no firm indication from the contract that a genuine issue of material fact exists as to the parties' intent, we turn to the extrinsic evidence. Foremost is the affidavit of Neal's project manager Chris Oehler, in which Oehler reported the pre-bid oral representations made by the architect that "all necessary arrangements had been made by [the Housing Authority] to assure that permanent electric utility service would be available for use by the contractor during construction on the project." The superior court concluded that this evidence was barred by operation of the parol evidence rule.

In *Western Pioneer, Inc. v. Harbor Enterprises, Inc.*, 818 P.2d 654 (Alaska 1991), we reversed a superior court's application of the parol evidence rule, and in doing so, summarized the current status of the rule in Alaska:

> The parol evidence rule is implicated when one party seeks to introduce extrinsic evidence which varies or contradicts an integrated contract. Once the rule is triggered, the parties' reasonable expectations are determined by applying a three-step test. *The first step is to determine whether the contract is integrated. The second step is to determine what the contract means.* Determining the meaning of a contract is treated as a question of law for the court except where there is conflicting

extrinsic evidence on which resolution of the contract's meaning depends. Whether there is conflicting extrinsic evidence is a question resolved by the court. Even where there is conflicting extrinsic evidence the court decides the question of meaning except where the written language, when read in context with its subject matter, is reasonably susceptible to both asserted meanings. . . . Extrinsic evidence may always be received in resolving these first two inquiries. *The third step is to determine whether the prior agreement conflicts with the integrated writing.* Whether there is conflicting extrinsic evidence depends on whether the prior agreement is inconsistent with the integration. Inconsistency is defined as "the absence of reasonable harmony in terms of the language and respective obligations of the parties."

*Id.* at 657 n. 4 (citations omitted) (emphasis added).

The parties do not dispute the trial court's conclusion that the contract was fully integrated. Under the steps articulated in *Western Pioneer* it thus becomes necessary to elaborate upon what the contract means in view of the extrinsic evidence. Because the procedural posture of this case is such that the question of meaning has never been presented to the trier of fact, we must consider whether the contract, when read in context with the extrinsic evidence, is "reasonably susceptible to both asserted meanings." *Western Pioneer*, 818 P.2d at 657 n. 4.

After considering all of the extrinsic evidence presented, we remain convinced that the contract does not contain a promise by the Housing Authority to supply Neal with a source of electricity for use during construction. The strongest evidence that Neal presents is the pre-bid oral statements made by the architect to Oehler noting that permanent electrical service "would be available" for Neal's use. Taken alone, these statements might be construed either as a promise or a prediction. However, in light of the written language of the contract and other surrounding circumstances, it is clear that the statements could not have reasonably

been interpreted to have been anything but predictions.

As noted above, bid documents provided by the Housing Authority contained two explicit provisions vesting the responsibility for providing all light, heat, and power necessary for construction with the contractor. Upon learning that there might soon be a convenient on-site source of permanent electrical power, however, Neal made no attempt to secure a written addendum to the contract through the formal procedures outlined by the bid documents. Moreover, in the face of two express terms imputing familiarity with local conditions to the contractor, Neal apparently chose not to visit two of the construction sites or contact any of the local utilities to discuss their scheduling intentions until after the contract was awarded. Finally, although the contract documents permitted Neal to complete construction as late as May and September 1989, at the time of the contract award Neal voluntarily chose to accelerate its schedule and aim for completion by December 1988.

■ Although courts will look to extrinsic evidence to assist in questions of contract interpretation, we cannot ascribe undue weight to statements which, by the contract's terms, are not controlling. In this regard, we adhere to the rule-of-thumb articulated in *Alaska Diversified Contractors, Inc. v. Lower Kuskokwim School District*, 778 P.2d 581 (Alaska 1989), *cert. denied*, 493 U.S. 1022, 110 S.Ct. 725, 107 L.Ed.2d 744 (1990): " 'after the transaction has been shown in all its length and breadth, the words of an integrated agreement remain the most important evidence of intention.' " *Id.* at 584 (quoting Restatement (Second) of Contracts § 212 cmt. b). Despite the architect's alleged pre-bid statements, when the testimony is viewed in context with all of the extrinsic evidence, it cannot be said that the contract language is "reasonably susceptible" to Neal's interpretation.

In view of this analysis, we conclude that the superior court properly applied the parol evidence rule to bar Oehler's testimony. To the extent that the architect's oral representations implied that the Housing Authority was willing to take on some "responsibility" for supplying a source of electricity for use during construction, the statements are not in "reasonable harmony" with the obligations of the parties as set out in the written agreement. The architect's pre-bid statements therefore directly contradict the meaning of the integrated agreement and will not be permitted to vary the terms of the contract.

### 3. Third-party beneficiary

■ Neal subtly presents one final argument to support its contention that the Housing Authority was responsible for providing the contractor with a source of permanent power. In Neal's view, it was a third-party beneficiary of the underlying contract between the Housing Authority and HUD. The record shows that HUD desired that the Housing Authority would have final agreements with the local utilities in place before awarding the main construction contract bid. From this, Neal infers that the Housing Authority possessed a duty to supply Neal with permanent electric power for construction.

■ This argument also lacks merit. Although Neal may have been at least an incidental third-party beneficiary of the Housing Authority's contract with HUD, a third-party right in a contract will not be implied absent evidence showing that the parties *intended* that at least one purpose of the contract is to benefit the third party. *Stewart–Smith Haidinger, Inc. v. Avi–Truck, Inc.*, 682 P.2d 1108, 1112 (Alaska 1984). Because Neal presented no supporting affidavits tending to show that there is a genuine issue for trial on this claim, Neal's third-party beneficiary argument cannot provide a basis for reversal.

We conclude that there are no genuine issues of material fact tending to show that the parties expected the Housing Authority to supply the sites with a source of permanent electricity for use during construction. Since under the contract Neal was therefore solely responsible for meeting its own power requirements, Neal's claim for an equitable adjustment of the contract price was properly denied as a matter of law. We affirm the grant of partial summary judgment in favor of the Housing Authority.

## B. *Neal's Motion for Reconsideration*

Neal additionally appeals from its unsuccessful motion for reconsideration in response to the trial court's entry of partial summary judgment. Neal urged the court to postpone its final decision until the court had an opportunity to hear all of the evidence at trial, especially expert testimony concerning "standard public construction industry practices." During brief oral argument at the pre-trial conference, Neal made two alternative requests of the court: (1) grant a short continuance to allow the court to process the arguments in Neal's newly submitted 60–page brief; or (2) designate the decision as a final judgment under Alaska Civil Rule 54(b).

Under Alaska Civil Rule 77(k), a litigant may move the court to reconsider a ruling under certain limited circumstances:

(i) The court has overlooked, misapplied, or failed to consider a statute, decision or principle directly controlling; or

(ii) The court has overlooked or misconceived some material fact or proposition of law; or

(iii) The court has overlooked or misconceived a material question in the case; or

(iv) The law applied in the ruling has been subsequently changed by court decision or statute.

A trial court's decision on a motion to reconsider will not be reversed on appeal absent an abuse of discretion. *State v. Alaska Continental Dev. Corp.*, 630 P.2d 977, 990 (Alaska 1980); *Brown v. State*, 563 P.2d 275, 279 (Alaska 1977); *Miller v. McManus*, 558 P.2d 891, 892 (Alaska 1977).

Given the evidence presented by the record, we cannot say that in denying Neal's motion to reconsider Judge Curda clearly erred. First, upon review of Neal's motion, we fail to detect any legal proposition that differs from those originally raised in opposition to the Housing Authority's motion for summary judgment. In light of this and the superior court's original twenty-page memorandum decision which thoroughly addressed the facts and Neal's various arguments, we are not convinced that in entering summary judgment, the court "overlooked" a material question, fact, or principle bearing on the case.

Second, in referring to the two experts that Neal planned to present at trial and requesting that the court review the contractor's trial brief, Neal effectively moved the trial court to reconsider its ruling based upon evidence that was not before it at the time it rendered its decision.[10] Neal provided no explanation for the delay in presenting the evidence.[11] Moreover, Neal had ample opportunity to secure the affidavits and depositions that it deemed necessary to oppose the summary judgment motion. The Housing Authority moved for partial summary judgment approximately a year and a half after the initiation of the case. Neal was given two forty-five-day continuances to conduct additional discovery. Following oral argument, Neal supplemented the record.

We refuse to allow a motion for reconsideration to be used as a means to seek an extension of time for the presentation of additional evidence on the merits of the claim. To do so would defeat the limited purpose of Rule 77(k): to remedy mistakes in judicial decision-making where grounds exist, while recognizing the need for a fair and efficient administration of justice. There being no compelling justification for re-opening the merits of Neal's claim, we affirm the

10. Neal apparently never provided the trial court with affidavits describing the experts' testimony, and the experts' depositions were not filed with the trial court until the day of the pre-trial conference—two days after the motion to reconsider. In addition, although it was timely, Neal submitted its trial brief the Monday following the court's Friday entry of partial summary judgment.

11. Summary judgment was entered on October 1, 1993. Neal explains that because Chris Oehler could not be deposed until mid-September 1993, in order to save money, Oehler and Neal's experts were deposed on the same trip. However, even if the depositions were scheduled too late to obtain copies in time to submit to the court, Alaska Civil Rule 56(e) allows a party to submit supporting affidavits to oppose summary judgment. Earlier, Neal submitted an affidavit from Oehler even though he was incarcerated out-of-state. Neal does not explain why it would have been infeasible to submit affidavits outlining the opinions of the experts as well.

superior court's denial of Neal's motion for reconsideration.

### C. *Evidentiary Ruling*

Finally, Neal appeals the trial court's evidentiary ruling which followed the denial of Neal's motion for reconsideration and precluded Neal from presenting further evidence on the electricity issue at trial. Neal argues that the ruling was in error because under Alaska Civil Rule 54(b), a grant of partial summary judgment not entered as a final judgment may be revised at any time after additional evidence is heard at trial. Neal therefore contends that in situations such as this where the party desires to present additional evidence, unless a Rule 54(b) final judgment is entered, the trial court is *obligated* to continue hearing evidence on the decided issue.

We do not agree. In cases partially adjudicated on a summary judgment motion, Alaska Civil Rule 56(d) provides that the facts that pertained to the entry of partial summary judgment "shall be deemed established." Although the trial court retains the option to hear additional evidence on the matter, *see Alaska N. Dev., Inc. v. Alyeska Pipeline Serv. Co.,* 666 P.2d 33, 38 (Alaska 1983), *cert. denied,* 464 U.S. 1041, 104 S.Ct. 706, 79 L.Ed.2d 170 (1984), the court is not required to do so. Like other questions of evidentiary relevance, this decision is reserved for the discretion of the trial court. *Id.* at 42.

We cannot say that Judge Curda was clearly mistaken in refusing to allow Neal to present additional evidence on the electricity issue at trial. We therefore affirm.

### IV. *CONCLUSION*

Neal has not shown that a genuine issue of material fact exists as to the parties' expectations concerning whether the Housing Authority was responsible for providing a source of permanent electricity for Neal's use during construction. We agree with the trial court that the construction contract was reasonably susceptible to only one interpretation: that the Housing Authority was not responsible for supplying Neal with a source of permanent electricity and that, consequently, Neal is not entitled to an equitable adjustment on that basis.

AFFIRMED.