Chris FROINES, Appellant,

v.

VALDEZ FISHERIES DEVELOPMENT ASSOCIATION, INC., Appellee.

No. S–10340.

Supreme Court of Alaska.

July 25, 2003.

Michael T. Stehle, Law Office of Michael Stehle, Anchorage, for Appellant.

Stephen McAlpine, Law Office of Stephen McAlpine, Anchorage, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, BRYNER, and CARPENETI, Justices.

*OPINION*

BRYNER, Justice.

## I. INTRODUCTION

Chris Froines sued the Valdez Fisheries Development Association for breaching an agreement to renew an annually issued vessel charter contract making him a member of the association's fishing fleet. The superior court entered summary judgment against Froines, ruling that the parol evidence rule barred him from using extrinsic evidence to prove that the association had promised to renew his charter contract, which, by its own terms, expired at the end of the fishing season in which it was issued. Froines appeals, contending that evidence of the association's renewal policy was admissible under the parol evidence rule because it neither modified nor contradicted the annual charter contract's terms. Because the superior court overlooked extrinsic evidence raising triable issues of fact as to the scope and meaning of the annual charter agreement, we reverse its summary judgment order.

## II. FACTS AND PROCEEDINGS

The Valdez Fisheries Development Association is a private, non-profit corporation organized by a group of Valdez fishermen in 1978 to run a salmon hatchery in the Eastern District of the Prince William Sound. The association recovers its hatchery costs through a program that allows it to harvest and sell some of its returning salmon each year. The association determines its operation costs, negotiates a price-per-pound with local fish processors, and figures the amount of salmon it needs to catch to recover its costs. It then arranges for the fish to be harvested during a one-month limited entry season between mid-June and mid-July. The remaining salmon are "common property" and are harvested by commercial and sport fishermen.

Since beginning its cost-recovery program, the association has used several arrangements for harvesting its returning salmon. For the first few years of the program, it contracted with a single individual to catch all the fish; for the next few years, it conducted its cost-recovery fishing through volunteer participation, allowing anyone with a permit to join in the fishing. But in 1994 the association converted to a "fleet" system of fishing. Under this system, it recruited ten local fishing vessels and entered into vessel charter agreements with their owners. The individual vessel charter contracts covered the one-month cost-recovery season and set out detailed terms addressing the fishing duties and compensation rates that would apply during this period. Under the terms of the charter agreements, fleet members would fish individually during the first ten days of the cost-recovery season, and each would be paid on the basis of its own production, receiving ten percent of the value of its catch or a minimum of $500 per day. During the balance of the cost-recovery season, if the association began harvesting more fish than it could sell, the charter contracts required the fleet members to fish together as a "combine fishery" under the direction of the association's cost-recovery fleet manager. For this combined fishing effort, the charter agreements provided that each vessel would be paid an equal share of the entire fleet's production.

The association evidently planned to retain the same fleet in 1995 that it used in 1994. But in response to inquiries from persons interested in joining the cost-recovery fishery, the association's board of directors and cost-recovery fleet manager, Mike Wells, began discussing ways to introduce new boats into the fleet. In a memo to the board during the 1994–95 off-season, Wells proposed a system to replace "the boat with the lowest landing each season." Wells favored the idea because it "would at least ensure that a spot becomes available each season" and "because it would help to put some additional incentive on the fishermen to not be the last in line."

The board discussed Wells's suggestion at its February 14, 1995, meeting, and the suggestion was apparently well received; the minutes of the board's meetings noted that

> Mike wrote a letter proposing that each year we drop the bottom boat. This would allow the group to change over time. The replacement list would be from past experience and a local or greater interest. We

will notify the fleet this year and see what they have to say.

A short time later, Wells described the new renewal arrangement in a cover letter sent to fleet members with their 1995 charter contracts:

> In talks with the VFDA's Board of Directors, I was asked to come up with a fair and equitable way to add new boats into our cost recovery program. After much consideration, we have decided to replace the boat with the lowest total pounds caught each year. A new vessel will be selected out of a pool of names to replace the number 10 boat. Of course someone will always be last and in the event that one of the remaining nine does not return, the tenth vessel will be offered a position.

After the 1995 cost-recovery season—the second season of fleet fishing and the first under the newly announced renewal arrangement—one of the fleet's ten original vessels decided to drop out of the fleet. This made it unnecessary to eliminate the lowest producing boat, and the association ultimately opted to keep the fleet at nine boats for the 1996 season. Wells explained the situation to fleet members in his cover letter to their 1996 vessel charter contracts: "Because VFDA will not fill the tenth vessel position for 1996, VFDA will not seek to drop the boat with the lowest pounds landed at the end of the [1995] season."

The situation remained unchanged after the 1996 season: the fleet retained its nine remaining original members, and the association elected not to add a new vessel. In his cover letter distributed with the 1997 vessel charter contracts to members of the fleet, Wells indicated that a price reduction was "the only change from our previous programs" and noted that "all other aspects of the harvest will remain the same."

Froines fished with the fleet from its opening season in 1994 through 1997. His boat, the NIKKI ANN, was the fourth highest pro-ducing boat during the 1997 cost-recovery season. After that season ended, most fishermen in the Valdez area went on strike to protest the low prices being offered by area processors. But Froines declined to join the strike. His decision to continue fishing during the strike upset many of the association's board members and officers. As the 1998 season approached, Wells recommended that Froines's boat be terminated from the fleet for unspecified "past performance" reasons. The board voted to follow Wells's recommendation in May 1998, and the association declined to renew Froines's contract as a member of the cost-recovery fleet.[1]

Froines sued the association. He claimed that, by declining to renew his fishing contract in 1998, it breached its promise to retain all but the least productive vessel in its fleet from year to year. During pretrial discovery, Wells and various association board members gave deposition testimony in which they arguably acknowledged that the association had implemented the alleged renewal policy in 1994 and that the policy remained in effect when the association refused to renew Froines's fishing contract in 1998. For example, in responding to questions about the May 1998 meeting at which the board voted to replace Froines's vessel, Jason Wells, a former association board member, admitted that the main concern "was that the board follow its policy and base that decision on production." Wells then confirmed that the policy at issue was the one "put into place at the end of the '94 season, beginning of [the] '95 season, that the lowest producing boat would, in fact, be dropped or replaced with a new boat."

There was also deposition testimony acknowledging that some board members were angry with Froines for his refusal to join the fishing strike during the 1997 fishing season and that they wanted to eliminate him from the fleet for that reason. Furthermore, Mike Wells conceded that the NIKKI ANN had been one of the fleet's most productive boats

---

1. The board also voted to terminate a second vessel from the fleet in 1998, the KERRI LYNN, a vessel that had consistently been the fleet's lowest producer and whose owner had experienced ongoing problems maintaining a regular fishing schedule. Because the projected cost-recovery harvest for 1998 had increased significantly over prior years, the board decided to add three new boats to the fleet: two to replace the NIKKI ANN and the KERRI LYNN, and a new boat to restore the fleet to its original size of ten vessels.

in 1997. Wells nonetheless claimed that the NIKKI ANN's production levels were lower in 1995 and 1996 and that Froines had generally put forth little effort during the fleet's periods of "combine" fishing. Froines denied these claims, pointing out that they were based on statistics compiled after the board voted not to renew his contract.

Shortly before trial, Froines moved for partial summary judgment on liability; relying on the deposition testimony and other documentary evidence, he claimed that the association had effectively admitted that it violated its renewal policy.[2] The association opposed Froines's motion. In addition, it moved to exclude any evidence offered by Froines to suggest that an enforceable renewal contract existed. According to the association, the parol evidence rule barred this evidence because proof of a promise to renew fleet membership would contradict the terms of the annual vessel charter contracts, which expressly limited the duration of the fishing contracts to the one-month cost-recovery season each year, contained no renewal provisions, and included an integration clause declaring that "there are no other agreements or understandings, oral or written, between the Owner and the Corporation."

After reviewing all evidence submitted in connection with the pending motions, hearing oral argument, and offering to hold a hearing to allow further evidence, the superior court entered a decision denying Froines's summary judgment motion and granting the association's parol evidence motion. In so ruling, the court concluded that extrinsic evidence of the renewal agreement would violate the parol evidence rule by modifying the express terms of the annual charter contracts. Because the parties agreed that this ruling effectively granted summary judgment to the association, the superior court entered a final judgment against Froines. Froines appeals.

## III. DISCUSSION

### A. Standard of Review

■ We independently review orders granting summary judgment, drawing all reasonable inferences in favor of the non-moving party to determine whether the record raises a genuine dispute as to any facts material to a viable legal theory and whether the moving party is entitled to judgment as a matter of law.[3]

### B. Parol Evidence Ruling

■ When a written statement sets out the terms of an agreement between contracting parties, the parol evidence rule generally precludes the parties from using evidence of prior agreements to contradict the written terms.[4] If the writing expresses part of the parties' agreement, the agreement is considered to be partially integrated; a writing that sets out the parties' complete agreement is deemed fully integrated.[5] The parol evi-

---

2. Froines also moved to exclude the testimony of other fishermen expressing their subjective impressions concerning whether the board's actions amounted to the adoption of a contractually binding renewal policy, and to preclude the association from relying on its annual vessel charter contracts as a legal basis for denying the existence of a renewal policy as a matter of law.

3. E.g., *Philbin v. Matanuska–Susitna Borough*, 991 P.2d 1263, 1265 (Alaska 1999).

4. E.g., *id.* at 1270; *Alaska Diversified Contractors, Inc. v. Lower Kuskokwim Sch. Dist.*, 778 P.2d 581, 583 (Alaska 1989). Alaska's version of the parol evidence rule is stated in AS 45.02.202:

   **Final written expression; parol or extrinsic evidence.** Terms with respect to which the confirmatory memoranda of the parties agree, or which are otherwise set out in a writing intended by the parties as a final expression of their agreement with respect to the terms included in the writing, may not be contradicted by evidence of a prior agreement or of a contemporaneous oral agreement, but may be explained or supplemented

   (1) by course of dealing or usage of trade (AS 45.01.205) or by course of performance (AS 45.02.208); and

   (2) by evidence of consistent additional terms unless the court finds the writing was intended also as a complete and exclusive statement of the terms of the agreement.

   This provision codifies the parol evidence rule in section 2–202 of the UNIFORM COMMERCIAL CODE and parallels section 215 of the RESTATEMENT (SECOND) OF CONTRACTS. *See Alaska N. Dev., Inc. v. Alyeska Pipeline Serv. Co.*, 666 P.2d 33, 36, 39 n. 5 (Alaska 1983).

5. RESTATEMENT (SECOND) OF CONTRACTS § 210 (1981).

dence rule forbids contradiction of partially integrated terms but allows them to be "explained or supplemented ... by evidence of consistent additional terms."[6] In contrast, the rule does not allow the terms of a fully integrated contract to be varied by evidence of additional terms, even if those terms are consistent.[7]

Our case law describes a three-step process for resolving parol evidence issues, requiring trial courts to consider: (1) whether the contract is integrated, (2) what the contract means, and (3) whether the prior agreement conflicts with the integrated agreement.[8] We have summarized the requisite inquiry as follows:

> The parol evidence rule is implicated when one party seeks to introduce extrinsic evidence which varies or contradicts an integrated contract. Once the rule is triggered, the parties' reasonable expectations are determined by applying a three-step test. The first step is to determine whether the contract is integrated. The second step is to determine what the contract means. Determining the meaning of a contract is treated as a question of law for the court except where there is conflicting extrinsic evidence on which resolution of the contract's meaning depends.... If the language is susceptible to [two] asserted meanings, then interpreting the contract is a question of fact for the jury. Extrinsic evidence may always be received in resolving these first two inquiries. The third step is to determine whether the prior agreement conflicts with the integrated writing. Whether there is conflicting extrinsic evidence depends on whether the prior agreement is inconsistent with the integration. Inconsistency is defined as

"the absence of reasonable harmony in terms of the language and respective obligations of the parties." ... While extrinsic evidence is important, nonetheless after the transaction has been shown in all its length and breadth, the words of an integrated agreement remain the most important evidence of intention.[9]

■ In the present case, the superior court acknowledged the need to conduct this three-step inquiry and briefly addressed each step. But the court did not clearly recognize that it was required to consider the totality of the evidence, including extrinsic evidence of the renewal agreement, in addressing the first two issues—integration and contractual meaning. The point is significant, since our cases have consistently emphasized that "[e]xtrinsic evidence may always be received in resolving [the] first two inquiries." [10]

Addressing the first issue, integration, the superior court simply quoted the charter agreement's integration clause and cited *Kupka v. Morey* for the proposition that "contracts containing such clauses are partially integrated so that parol evidence may not be used to prove a provision that contradicts or is inconsistent with a specific term of the contract." [11] The court then turned to the issue of contractual meaning. Noting that time charter agreements are inherently fixed-period contracts and that the agreements at issue here expressly fixed the duration of the charters to "the period of June 20 ... to July 20" each year, the court summarily ruled that "[t]he meaning of this term is fairly clear from the language of the time charter, and Froines does not identify any ambiguity in this language." Turning to the third-step issue of conflict, the court, again

---

**6.** AS 45.02.202(2); *see also* RESTATEMENT (SECOND) OF CONTRACTS §§ 215, 216(1) (1981).

**7.** AS 45.02.202(2); RESTATEMENT (SECOND) OF CONTRACTS § 216(1) (1981).

**8.** *E.g., Alaska Diversified Contractors, Inc.*, 778 P.2d at 583.

**9.** *Western Pioneer, Inc. v. Harbor Enters., Inc.*, 818 P.2d 654, 657 n. 4 (Alaska 1991) (citations omitted).

**10.** *Western Pioneer, Inc.*, 818 P.2d at 657 n. 4; *see also Northern Timber Corp. v. State, Dep't of Trans. & Pub. Facilities*, 927 P.2d 1281, 1287 (Alaska 1996) (quoting *Western Pioneer, Inc.* and applying the three-part test); *Neal & Co., Inc. v. Ass'n of Village Council Presidents Reg'l Hous. Auth.*, 895 P.2d 497, 504 (Alaska 1995) (same).

**11.** 541 P.2d 740, 748 (Alaska 1975).

appearing to rely exclusively on the plain meaning of the written charter agreements, concluded that Froines's allegation of a renewal agreement "was inconsistent with the unambiguous terms of the time charter in that it contradicted the provision for the anticipated duration of the charter." [12]

Since Froines has not challenged the validity of the charter agreements' integration clauses or alleged that those agreements do not accurately memorialize *part of* the parties' overall agreement, we agree with the trial court's reliance on *Kupka v. Morey* to establish that the integration clauses alone allowed the charter agreements to be treated as partially integrated contracts.[13] But the court's conclusion on this point did not eliminate the need to consider and weigh the totality of the evidence for purposes of determining the intended scope and meaning of the charter agreements in relation to the alleged renewal agreement. To the contrary, recognizing the charter agreements to be *partial* expressions of the parties' agreement made it crucial to determine the scope and meaning of the full agreement in light of all available evidence—including Froines's proposed evidence of a renewal agreement.

As we indicated earlier, however, the superior court's second-step determination of contractual meaning focused narrowly and exclusively on the literal terms of the charter contracts' one-month duration provisions. The superior court saw no need to look further, noting that "Froines does not identify any ambiguity in this language." This find-

ing suggests a belief by the court that Froines's extrinsic evidence of a renewal agreement could not be considered without an initial showing of ambiguity in the written provisions. Yet we have expressly recognized that a trial court's duty to consider the totality of the evidence in resolving issues of integration and contractual meaning extends to all cases and requires no preliminary indication of ambiguity in the written agreement:

> In the past, this court has stated or implied that resort to extrinsic evidence can take place only after a preliminary finding of ambiguity. Thus, a court would review extrinsic evidence to make a preliminary finding of ambiguity and only then consider extrinsic evidence in construing the contract. A minority of this court has repeatedly criticized this two-tiered test as artificial and unduly cumbersome, noting that it offers no advantage over one which initially turns to extrinsic evidence for such light as it may shed on the reasonable expectations of the parties. We think this criticism is sound and hold, as we have intimated before, that a court in this jurisdiction may initially turn to extrinsic evidence in construing a contract.[14]

Here, under the evidence before the superior court at the time of its ruling, the scope and meaning of the charter agreements were hotly disputed issues. The association denied formally adopting the alleged renewal policy and maintained that the charter agreements were fully integrated contracts that expressed the parties' complete agreement,

12. The court went on to determine that evidence of the renewal agreement also could not be admitted as proof of a separate contract, concluding that it would have been natural for the parties to have included the renewal agreement in the charter contracts if they had meant to adopt it. But as the superior court itself seems to have recognized, this analysis would have applied only if the court had found the charter agreements to be fully integrated contracts—an issue that the court never addressed. In any event, our conclusion that reversal is necessary because the alleged renewal agreement would not necessarily have contradicted the charter agreements makes it unnecessary to address this alternative analysis.

13. Under *Kupka v. Morey*, however, an integration clause is not completely self-validating,

since parol evidence must be considered to determine whether the clause is valid:

> [C]ontracts containing such clauses are partially integrated so that parol evidence may not be used to prove a provision that contradicts or is inconsistent with a specific term of the contract (other than the integration clause itself).

541 P.2d at 748. Here, of course, the superior court had no need to consider parol evidence in determining the validity of the integration clause under *Kupka*, since Froines essentially acknowledged that the charter contracts were partially integrated agreements.

14. *Alyeska Pipeline Serv. Co. v. O'Kelley,* 645 P.2d 767, 771 n. 1 (Alaska 1982) (citations omitted).

ruling out any possibility of an enforceable renewal agreement. Froines, on the other hand, asserted that the association had all but admitted the renewal policy's existence. Portraying the charter agreements as contracts that were limited in subject and scope to governing the fleet's fishing activities during the cost-recovery season proper, Froines characterized the renewal policy as a supplemental contractual term that was consistent with the charter agreements because the renewal policy merely enabled the parties to determine how the fleet would be selected between each season of fishing.

■ "Generally, the interpretation of a writing is a task for the court. However, where 'interpretation of a written instrument turns on the acceptance of extrinsic evidence, the process of weighing such evidence should be for the trier of fact.' " [15] More specifically, we have explained that

> [w]hether there is conflicting extrinsic evidence is a question resolved by the court. Even where there is conflicting extrinsic evidence the court decides the question of meaning except where the written language, when read in context with its subject matter, is reasonably susceptible to both asserted meanings. If the language is susceptible to both asserted meanings, then interpreting the contract is a question of fact for the jury. Extrinsic evidence

may always be received in resolving [this issue].[16]

Viewing the totality of the evidence in the present case in the light most favorable to Froines, we find extrinsic evidence that, if accepted, is reasonably susceptible to being viewed as proof of a renewal policy that would supplement, rather than contradict, the terms of the annual vessel charter agreements. In context, the alleged renewal policy could reasonably be seen as merely determining how the association would select candidates for its fleet from season to season—a subject beyond the narrower scope of the fixed-period charter agreements. So construed, the renewal policy would neither extend nor alter the terms of the annual charter agreements; it would simply promise those vessel owners who were invited to join the current year's fleet that, in return for a productive season of fishing under the current charter agreement, they would be invited back to fish with the fleet the following year under whatever terms the association might offer them—*assuming* that the association elected to retain its fleet method of cost-recovery fishing.[17] Accordingly, the alleged renewal policy would not contradict the terms of the vessel charter agreements.[18]

■ Because the alleged renewal policy is not inconsistent with the charter agreements, the parol evidence rule does not bar extrinsic

15. *Id.* at 771 n. 2 (citation omitted) (quoting *Hausam v. Wodrich*, 574 P.2d 805, 809 (Alaska 1978)).

16. *Western Pioneer, Inc. v. Harbor Enters., Inc.*, 818 P.2d 654, 657 n. 4 (Alaska 1991) (citations omitted).

17. In our view, the evidence in the record fails to suggest any implied promise or commitment by the association to retain its fleet method of fishing from one year to the next, thus necessarily making any right of renewal accruing to successful fleet members at the end of a season contingent on the association's election to pursue the same method of cost-recovery fishing the following year.

18. In analyzing the viability of the alleged renewal policy as a separate contract, the superior court expressed the view that this kind of arrangement would fail for want of sufficiently specific terms and for lack of consideration. We disagree. As described, the terms of the bargain are fairly specific: in return for a productive season of fishing (defined as not being the least productive boat in the fleet), the alleged renewal policy promises that if the fleet method is continued, current fleet members will be invited back to fish again the following season. Nor would this arrangement lack mutual consideration. From the association's point of view, as Mike Wells observed when he recommended the renewal policy to the board in 1995, the policy offered an equitable way of rotating new boats into the fleet, while simultaneously encouraging more efficient production by helping "to put some additional incentive on the fishermen to not be the last in line." And from the cost-recovery fleet's perspective, the policy offered a way of earning the right to be invited to fish again if the association retained its fleet system the following year.

evidence tending to prove the policy's adoption and continued existence. And because reasonable jurors viewing the evidence in the light most favorable to Froines could find that the association adopted and breached a policy of this kind, we conclude that entry of summary judgment for the association amounted to error.[19]

## IV. CONCLUSION

For these reasons, we REVERSE the superior court's judgment and REMAND the case for further proceedings.

EASTAUGH, Justice, not participating.

19. Froines additionally maintains that the superior court erred in denying his motion for partial summary judgment on the issue of liability. We find no merit to this point since, in our view, substantial evidence supports both parties' positions and raises genuine issues of material fact that preclude summary judgment. Froines separately argues that the court erred in denying his motion to exclude testimony concerning subjective impressions as to the scope and meaning of the disputed renewal policy. But this argument raises evidentiary issues that are ordinarily committed to the sound discretion of the trial court in the first instance. Because the court's denial of Froines's motion to exclude this evidence appears to have been dictated by its ruling on the parol evidence issue, which we have now reversed, we see no need to address this evidentiary point at present.