NORTHERN TIMBER CORPORATION,
an Alaska corporation, Appellant,

v.

STATE of Alaska, DEPARTMENT OF
TRANSPORTATION AND PUBLIC
FACILITIES, Appellee.

No. S–6688.

Supreme Court of Alaska.

Nov. 22, 1996.

Donna C. Willard, Law Offices of Donna C. Willard, Anchorage, for Appellant.

William F. Cummings, Assistant Attorney General, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

## OPINION

EASTAUGH, Justice.

### I. INTRODUCTION

Northern Timber Corporation (NTC) and the Alaska Department of Transportation and Public Facilities (DOT/PF) entered into a public works contract, part of which required NTC to place, and later remove, "surcharge material" to aid compaction of underlying soils. DOT/PF required NTC to reuse the removed material in another part of the project in a way NTC claimed is contrary to the contract. NTC then filed a contract claim. We affirm the denial of that claim.

### II. FACTS AND PROCEEDINGS

In July 1991 DOT/PF invited bids and published contract documents for a project to improve the Hoonah Airport.[1] Part of the project required use of a three-stage process to construct an access road, taxiways, apron, and lease lots. Stage one required construction of five feet of embankment.[2] Stage two called for placing three to six feet of "surcharge material" on top of the embankment. The surcharge would remain in place for six to eight months to load the embankment and induce settlement in the underlying fill and native material. The surcharge material was to be the same class of material, known as borrow embankment, to be used for the embankments. Stage three required the post-settlement removal of surcharge material down to the subgrade (the finished grade of the embankment)[3] and the placement of an asphalt concrete paving section on the subgrade.

Contract Addendum No. One, dated August 9, 1991, provided that "[t]he placement of surcharge material shall be paid for as Borrow Embankment."[4] Section 330.3 paragraph f of the Special Provisions provided that "[t]he removal of surcharge material shall be paid for as unclassified excavation."[5] Addendum No. One further stated that "[a]ll unclassified excavation material suitable for re-use on the project shall be paid for only once as unclassified excavation. The unclassified excavation material shall not be paid for again when it is used as another contract item."

Another part of the project involved improving the existing runway and required that embankments be built on either side of the runway with borrow embankment material. These embankments were to be built with the same class of materials NTC was to

---

1. The contract documents consist chiefly of Standard Specifications (General Contract Provisions) which provide the basic framework of the contract, project-specific Plan Sheets, Special Provisions which modify the Standard Specifications, and Addendum No. One which modifies the Special Provisions.

2. The embankment was the foundation upon which finished paved surfaces would be laid.

3. For example, if three feet of surcharge material were placed in a given area, resulting in a one-foot settlement during the stage two waiting period, the contractor would need to remove two feet of surcharge material during stage three to reach subgrade.

4. The contract defined "borrow embankment" as follows:

    Materials for embankment or borrow embankment shall be earth, sand, gravel, rock or combinations thereof, and shall contain no muck, peat, roots, sod or other deleterious matter....

    ....

    Borrow shall involve approved material required for the construction of embankments or other portions of the work. The Contractor shall make his own arrangements for obtaining borrow and shall pay all costs involved.

5. Construction Specification 330.2 defined "unclassified excavation" as including "all excavation, regardless of the material encountered, as shown on the plans or as directed by the Engineer."

use in the surcharge. The staged construction method was not prescribed for this part of the project because the runway was not being built from the ground up and subsidence was not expected.

DOT/PF received five bids. NTC submitted the lowest bid, for $3,435,027, and was awarded the contract.[6] The contract is dated September 22, 1991. The specified completion date was October 31, 1992.

At a post-award, pre-construction conference on September 26, 1991, DOT/PF's Project Engineer (Engineer) and NTC disagreed on interpretation of the contract regarding reuse of any surcharge material removed above the subgrade following settlement in the staged construction area. NTC expressed an intention to construct the runway embankment from "new" material taken from the borrow pits and to use the removed surcharge as subbase and crushed aggregate.[7] It claimed that the contract allows the contractor to waste the removed surcharge, and that NTC could consequently use the removed surcharge at its sole discretion. DOT/PF asserted that the removed surcharge was usable "unclassified excavation" which NTC had to use in the borrow section of the project before importing new borrow materials.

In late November the Engineer advised NTC that NTC's proposed schedule did not accommodate the use of the surcharge excavation in the runway embankment, as the contract required. The Engineer further advised NTC that DOT/PF would not pay for borrow embankment used as a substitute for suitable surcharge material excavated above subgrade. Thus, the Engineer prevented NTC from using the removed surcharge in the manner NTC claimed it had expected and instead required NTC to use the removed surcharge on the runway improvement, in the places labeled on Plan Sheet No. 5 as "borrow embankment." [8]

NTC pursued an administrative contract claim, and ultimately claimed $526,819. (The record does not reflect how it calculated its claim.) The Engineer denied the claim and the Contracting Officer rejected NTC's appeal. NTC appealed the Contracting Officer's decision, and the Hearing Officer issued an extensive decision denying the claim. DOT/PF's deputy commissioner adopted the Hearing Officer's decision. NTC appealed to the superior court, which affirmed. NTC now appeals to this court.

## III. DISCUSSION

NTC reads the contract to have required (or at least permitted) the contractor to waste (discard) the removed surcharge material. NTC argues that the contract consequently allowed NTC to use any removed surcharge material elsewhere in the project (e.g., in the paving section, as NTC wished to do). NTC claims the contract prevented the Engineer from requiring NTC to use the removed surcharge in the runway embankment. Instead, NTC asserts the contract

6. The total bid price was comprised of fixed-price bid items and unit-priced items. The borrow embankment unit-priced item represented more than half the total contract price.

7. NTC stated that it planned to remove the surcharge remaining after settlement, run it through a crusher and use it for runway, apron, and lease lot paving section materials. NTC's president, Roger Schnabel, explained the benefit of processing the removed surcharge: "By processing the excess surcharge through a crusher and using it for paving section materials (subbase material, base material, and aggregate for asphalt concrete paving), we would save ourselves the costs of excavating, generating and hauling those materials from a borrow pit."

NTC claimed it expected to be paid for the borrow material to be used to construct the runway embankment at the rate it bid for "borrow embankment" in the contract, i.e., $3.97 per ton. The Engineer estimated pre-bid that 93,500 tons of borrow embankment would be placed as runway embankment.

8. DOT/PF paid NTC for the initial placement of the surcharge on the staged areas at the rate NTC bid for borrow material, $3.97 per ton. DOT/PF later paid NTC to remove this same surcharge material at the rate NTC bid for "unclassified excavation," $3.79 per cubic yard. (Each cubic yard was equivalent to 1.8 tons.) Thus, DOT/PF paid NTC first to provide and place this material as surcharge, during the second stage, and paid it again to remove surcharge material remaining above subgrade, during the third stage; NTC was not paid a third time when it deposited this same material as runway embankment. NTC was apparently paid for the subbase and crushed aggregated courses at the rates it bid.

permitted NTC to build the runway embankment with material not taken from the surcharge, thus allowing NTC to begin building the runway embankment before the end of the surcharge waiting period.

NTC alternatively argues that the contract was ambiguous, because both contract readings it proposes (the contract either *required* removed surcharge to be wasted, or *permitted* it to be wasted at the contractor's option) are more reasonable than the reading DOT/PF advances (the contract required removed surcharge to first be used in the runway embankment); NTC reasons that the contract must therefore be construed against the drafter, DOT/PF.[9]

■■■ This appeal turns on whether NTC's interpretation of the contract is reasonable.[10] We conclude that it is not.

### A. *The Contract Terms*

■■ Two particular passages in the contract documents preclude the reading NTC proposes. The first is Section 330.1, a construction specification describing excavation and embankment on the project. It provides:

> This item shall consist of excavating, removing, hauling, satisfactorily placing or disposing of excavated materials in accordance with these specifications and in conformity with the dimensions, typical sections, lines and grades as shown on the plans or established by the Engineer.

> All suitable material taken from excavation shall be used in the formation of embankment, subgrade, and for backfilling as indicated on the plans or as directed by the Engineer. When the volume of the excavation exceeds that required to construct the embankments to the grades indicated, the excess shall be used to grade the areas of ultimate development or wasted as directed. When the volume of excavation is not sufficient for constructing the fill to the grades indicated, the deficiency shall be supplied by the Contractor from borrow sources shown on the plans or sources located off of airport property and meeting approval of the Engineer.

(Emphasis added.) The emphasized sentence provides that "[a]ll suitable material" taken from excavation "shall be used" in embankments "as indicated on the plans or as directed by the Engineer." The surcharge originated as borrow, and was the same type and grade of material to be used in the runway embankment. The surcharge would remain "suitable" for use in the runway embankment after it was removed from the staged construction areas. It was to be removed by the process of excavation. Section 330.1 thus unambiguously required NTC to reuse the removed surcharge in the runway embankment if the Engineer directed it to do so.

The other critical passage is found in Addendum No. One. It modified the Special

---

9. NTC argues that the contract contains an ambiguity that relates directly to its claim, and that the ambiguity should be resolved against DOT/PF. *See Wessells v. State, Dep't of Highways,* 562 P.2d 1042, 1050 (Alaska 1977) ("[A]mbiguities are construed against the party that supplied and drafted the form (the state)").

10. Because the superior court acted as an intermediate appellate court, we owe " 'no deference ... to the lower court's decision, but, rather, independently scrutinize directly the merits of the administrative determination.' " *State, Dep't of Revenue v. Atlantic Richfield Co.,* 858 P.2d 307, 308 (Alaska 1993) (alteration omitted) (quoting *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.,* 746 P.2d 896, 903 (Alaska 1987)). In this case we must examine the agency's interpretation of a contract and its bidding documents. This presents a question of law. We have set forth two standards of review applicable to questions of law: (1) the rational basis standard under which the court defers to an agency's interpretation of its regulations unless it is unreasonable; and (2) the substitution of judgment standard under which the court interprets the relevant statutes and regulations independently. *Id.* (citing *Tesoro,* 746 P.2d at 903). We use the rational basis standard when the questions of law involve agency expertise or where the agency's specialized knowledge and experience are particularly probative as to the meaning of the statute. *Id.* (citing *Union Oil Co. of Cal. v. State,* 804 P.2d 62, 64 (Alaska 1990)). Although this case concerns interpretation of construction bidding documents, and thus potentially implicates DOT/PF's special expertise and knowledge, the Engineer, Contracting Officer, Hearing Officer, and Deputy Commissioner do not appear to have invoked that expertise or knowledge. We therefore apply the substitution of judgment standard in interpreting the contract documents.

Provisions, including Section 330.5, which described the basis of payment for excavation and embankment work. Section 330.5.a originally concerned the payment for "unclassified excavation." This category of work applied to removal of the surcharge. (Section 330.3.f was modified by the Special Provisions to provide that "The removal of surcharge material shall be paid for as unclassified excavation.") Addendum No. One modified Section 330.5.a by adding the following language: "All unclassified excavation material suitable for re-use on the project shall be paid for only once as unclassified excavation. The unclassified excavation material shall not be paid for again when it is used as another contract item." The removed surcharge was unclassified excavation material and was suitable for reuse as another contract item, runway embankment. As modified, Section 330.5.a precluded additional payment when the surcharge was reused.

Read in conjunction, these provisions clearly informed bidders that the contractor would have to reuse the removed surcharge in the runway embankment if the Engineer so ordered. The contract also clearly informed bidders that the contractor would be paid at borrow embankment rates when it placed the borrow material in the surcharge and at unclassified excavation rates when it removed the borrow material from the surcharge, but would not be paid again if the Engineer required reuse of the surcharge material.

Such reuse was consistent with the anticipated construction schedule. Any other use was potentially wasteful.

When he denied NTC's claim, the Engineer noted that "A reasonably prudent contractor could not make the assumption that Specifications would allow the wasting of approximately 60,000 cubic yards of excavated material with payment for embankment to replace this material. His contention that it is waste that he could use to make processed aggregates cannot be supported by the contract." (Plan Sheet 3 notes that each cubic yard of borrow embankment is estimated to equal 1.8 tons. Thus, 60,000 cubic yards of borrow embankment is equal to 108,000 tons.) The Engineer also noted that had

Addendum No. One not been issued, NTC would have been paid both for excavating and then borrow embanking the surcharge material, but that "[t]he addendum was issued and specifically deleted this double payment."

NTC argues that other provisions in the contract documents either require or reasonably permit a different interpretation. It relies heavily on this language in Special Provision Section 330.3.f:

> The removal of surcharge material shall be paid for as unclassified excavation. Any excess surcharge material should not be wasted at the toe of the planned embankment limits or on the embankment side slopes because differential settlement of the slope may occur, causing longitudinal cracking and displacement of the embankment surface. *All waste and excess material should be wasted off of airport property.*

(Emphasis added.) According to NTC, this language required that the removed surcharge be wasted. This language cannot reasonably be interpreted in that fashion. Removed surcharge needed for the runway embankment was not waste or excess. Removed surcharge left over after completion of the runway embankment, and any other contract items for which it might be suitable for reuse, would be "excess" and appropriately treated as "waste." In that event, Section 330.3.f simply specified how it·was to be disposed of without harming the permanent embankments. That section did not categorize all removed surcharge as waste; its specification of where "excess" surcharge might be wasted is consistent with treating as "excess" only that surcharge material not needed or usable elsewhere in the project.

### B. *Plan Sheets No. 5 and No. 3*

NTC argues that DOT/PF's direction to construct the runway embankment with removed surcharge conflicts with Plan Sheets No. 5 and No. 3. Plan Sheet No. 5 is a drawing of the runway, on which arrows connect the words "UNCLASSIFIED EXCAVATION" to places where material was to be removed, and connect the words "BORROW EMBANKMENT" to places where

material was to be added above existing ground. NTC notes that the drawings do not depict "excess surcharge" as "unclassified excavation," and do not depict "excess surcharge material" or "suitable unclassified excavation" being used before "BORROW EMBANKMENT" for the runway embankment. Plan Sheet No. 5 represents that the runway embankment will be constructed with "BORROW EMBANKMENT."

NTC claims that it prepared its bid based on the material quantities estimated by DOT/PF. Plan Sheet No. 3 estimates that 93,500 tons of "borrow embankment" would be needed for the "runway." NTC argues that it based its bid on the assumption that in improving the runway it would use 93,500 tons of "borrow embankment," not removed surcharge. Thus, NTC contends that it reasonably assumed that the contract specified payment for furnishing 93,500 tons of borrow embankment for runway embankment at the unit price of $3.97 per ton, and that NTC's bid for borrow embankment reflected that assumption.

We view the two Plan Sheets in connection with the relevant sections of the contract documents. Section 50–04 of the General Provisions sets the priority for reading the different contract documents. It states that in cases of conflict between provisions, the Special Provisions take precedence over Plans, while the Plans take precedence over the Standard Specifications, which take precedence over Standard Drawings.[11]

In our view, the contract provisions discussed in Part III.A above are controlling, and clearly required the contractor to reuse removed surcharge in the runway embankment if so directed by the Engineer. Assum-

ing there was any inconsistency between these Plan Sheets and the contract provisions discussed above, those provisions take precedence. Per Section 50–04, Addendum No. One takes precedence over the Plan Sheets because the addendum modifies the Special Provisions. Notwithstanding any inconsistency, therefore, the contract did not preclude the Engineer from directing NTC to construct the runway embankment with removed surcharge material, and did not entitle NTC to relief on its claim.

Further, the Plan Sheets were not inconsistent with the contract reading compelled by Section 330.1 and Section 330.5.a as modified by Addendum No. One. The plan sheets did not preclude the Engineer from directing reuse of the surcharge in the runway, even though the Plan Sheets themselves did not expressly specify that reuse.

The reference on Plan Sheet No. 5 to "borrow embankment" does not permit or require a conclusion that a contractor could fail to reuse removed surcharge in the runway embankment. The surcharge material did not lose its borrow embankment quality when it was used as surcharge and then removed. Plan Sheet No. 5 was consistent with the reuse directed by the Engineer.

Plan Sheet No. 3 contained an estimate that 93,500 tons of borrow embankment would be placed in the runway project (i.e., the runway embankment). It also estimated that a total of 390,000 tons of borrow embankment would be placed for the entire project. NTC argues the contract consequently represented that all 93,500 tons in the runway would be paid for as "borrow embankment." NTC claims that the Engineer's direction to reuse the surcharge mate-

---

**11.** Section 50–04, COORDINATION OF PLANS, SPECIFICATIONS AND SPECIAL PROVISIONS, states:

These specifications, the plans, special provisions, and all supplementary documents are essential parts of the contract, and a requirement occurring in one is as binding as though occurring in all. They are intended to be complementary and to describe and provide for a complete work. In case of discrepancy, calculated dimensions will govern over scaled dimensions.

Should other discrepancies appear between any of the following parts of the contract, a

listed part shall take precedence over all those listed below it:
1. Special Provisions
2. Plans
3. Standard Specifications
4. Standard Drawings

The Contractor shall take no advantage of any apparent error or omission in the plans or specifications. In the event the Contractor discovers such an error or omission, he shall immediately notify the Engineer. The Engineer will then make such corrections and interpretations as may be deemed necessary for fulfilling the intent of the contract.

rial meant that none of the 93,500 tons would be paid for as borrow embankment. According to the decision of the Contracting Officer, the Design Engineer tabulated the quantities as "final, in-place" quantities. The Contracting Officer also observed that NTC's conclusion that the estimated quantity for borrow embankment includes the surcharge plus the total embankment prism "is obviously faulty with respect to the lease lot area." We agree. We also observe that NTC was paid at the borrow embankment rate when it first provided and placed the material in the surcharge, including the material potentially available for reuse. In effect, NTC was paid up front at the borrow embankment rate for material ultimately destined for the runway embankment. It was paid to handle the same material again when it excavated the surcharge material to subgrade and moved it to the runway embankment. Plan Sheet No. 3 was not inconsistent with this reuse of removed surcharge material.

## C. *DOT/PF Memoranda*

NTC relies on three DOT/PF memoranda to support its interpretation of the contract. *See Western Pioneer, Inc. v. Harbor Enterprises, Inc.,* 818 P.2d 654, 657 n. 4 (Alaska 1991) (stating that extrinsic evidence may always be considered to determine (1) whether a contract is integrated, and (2) the meaning of a contract).[12]

In a pre-bid memorandum apparently reviewing the bidding documents, Steven Bradford, Construction Section Chief of the Southeast Region, wrote:

Stage 3 Construction last paragraph, does this mean surcharge material must be wasted off the project or can it be used on the runway widening? Clarify.

Bradford's question indicates potential uncertainty regarding interpretation of Section 330.3.f. It also predates Addendum No. One, which modified Section 330.5.a. That modification, in conjunction with other contract language (particularly Section 330.1) made it clear that the Engineer could direct that removed surcharge material be incorporated in the runway embankment, and that removed salvage material could not be wasted.

In a November 13, 1991, post-bid memorandum to Bradford, Project Engineer Larry Geise stated:

The following is a partial listing of changes to plan quantities and possible grade problems field personnel have encountered to date. The design section has been contacted and is working with project personnel to resolve any posible [sic] conflicts.

1) Estimate of Quantities: Runway Borrow "B" Quantities-

PLAN: 93500 T FIELD ESTIMATE: 0 T.

Embankment placement for runway will be obtained in large part by useable unclassified excavation from the surcharge area. The only payment for borrow will be if subsidence in surcharge area is high.

. . . .

From what we can determine design did not compute the surcharge tonnage in the total amount of borrow required. Borrow

---

12. In *Western Pioneer,* we reversed a superior court's application of the parol evidence rule, and in doing so, summarized the current status of the rule in Alaska:

The parol evidence rule is implicated when one party seeks to introduce extrinsic evidence which varies or contradicts an integrated contract. Once the rule is triggered, the parties' reasonable expectations are determined by applying a three-step test. The first step is to determine whether the contract is integrated. The second step is to determine what the contract means. Determining the meaning of a contract is treated as a question of law for the court except where there is conflicting extrinsic evidence on which resolution of the contract's meaning depends. Whether there is conflicting extrinsic evidence is a question re-

solved by the court. Even where there is conflicting extrinsic evidence the court decides the question of meaning except where the written language, when read in context with its subject matter, is reasonably susceptible to both asserted meanings.... Extrinsic evidence may always be received in resolving these first two inquiries. The third step is to determine whether the prior agreement conflicts with the integrated writing. Whether there is conflicting extrinsic evidence depends on whether the prior agreement is inconsistent with the integration. Inconsistency is defined as "the absence of reasonable harmony in terms of the language and respective obligations of the parties."

818 P.2d at 657 n. 4 (citations omitted).

shown in the estimate of quantities is only the amount needed to complete the fill that is to be left in place.

This memorandum is consistent with DOT/PF's position, and does not support NTC's claim that the contract either required that the surcharge be wasted, or permitted it at NTC's option. The estimates did not include the borrow needed for the surcharge apart from what was to be left in place. The memorandum is consistent with DOT/PF's position because it confirmed that the project contemplated reuse of the removed surcharge. NTC gambled that there would be little subsidence (and thus, ample surcharge for other use), and asserts that DOT/PF anticipated substantial subsidence (and thus, little or no surcharge material available for use again elsewhere). If there was substantial subsidence, NTC would have been required to provide borrow from some source other than surcharge, and would have been paid accordingly.

Bidders had to anticipate the effect of more or less subsidence because it would affect the amount of unclassified excavation of surcharge remaining above subgrade.

In a January 9, 1992, memorandum Project Engineer Pete Bednarowicz stated:

> Addendum One, which states "The placement of surcharge material shall be paid for as Borrow Embankment" was included at Construction's request. The quantity tables were not modified to show first placement quantities for each work area. In other words, we did not show on the plan estimate of quantities the first placed quantities for the road, apron, lease lots and taxiways to include the surcharge material (we give final placement quantities only and a separate table on sheet 27 for surcharge quantities). If you use Larry's estimate, Construction is showing an approximate 37,000 ton overrun (9.5%) which is within normal estimating values. However, *even though the total estimated quantities are correct, it was not clear that Borrow "B" (surcharge) material is first placed on the apron, taxiway, lease lots*

> *and road and then moved to the runway as unclassified (not Borrow "B") material.*

(Emphasis added.)

NTC argues that this is an "unqualified admission" that DOT/PF "at least perceived the presence of an ambiguity." In context, these comments are part of a memorandum which almost exclusively discusses the quantities specified in the estimates. In context, the memorandum simply notes correctly that the plan estimate of quantities did not make it clear that surcharge was to be moved to the runway and paid at unclassified excavation, rather than borrow embankment, rates. Other contract provisions discussed in Part III.A above, however, cured the estimates' lack of clarity on this topic. Read as a whole, and giving proper priority to its different parts, the contract was sufficiently definite to inform knowledgeable readers, such as contractors bidding on the project, that removed surcharge was to be reused and could not be wasted, and upon reuse was not to be paid for again when used as another contract item.

The three DOT/PF memoranda do not establish an ambiguity which would permit the interpretation NTC proposes.

### D. *Payment for the Reuse NTC Proposed*

Because the Engineer permissibly directed that the removed surcharge be placed in the runway embankment, Section 330.5.a, as modified by Addendum No. One, applies to NTC's contract claim. That section is entitled *Basis of Payment*. It states in relevant part:

> All unclassified excavation material suitable for re-use on the project shall be paid for only once as unclassified excavation. The unclassified excavation material shall not be paid for again when it is used as another contract item.

The contract contemplates that the contractor will reuse suitable unclassified excavation material. As previously discussed, Section 330.3.f provides that removed surcharge is paid for as unclassified excavation. As modified by Addendum No. One, Section 330.5.a provides that NTC could only be paid once for removed surcharge—when NTC initially

removed the surcharge to reach subgrade and not when it used removed surcharge as another item, in the runway embankment. Since removed surcharge is denominated unclassified excavation, and this is the only reasonable label for removed surcharge if it is not borrow embankment, as NTC insists it is not, Addendum No. One does not allow NTC to be paid for reusing the removed surcharge.

That does not mean, however, that NTC had no remedy. Section 90–04 of the contract permitted either party to seek price adjustments as compensation for altered quantities. The Hearing Officer noted that NTC had indirectly argued that reuse of the surcharge would result in a variance of a bid quantity for borrow embankment of more than twenty-five percent and would "thus be a basis for a claim in itself." The Hearing Officer noted that "[i]f this is indeed a claim, then Northern Timber should have brought it as a claim." The superior court also noted that NTC had not made a variance claim.

Even though NTC made no such claim, Section 90.04 provided NTC a means to remedy at least some of the consequences of any discrepancy between the clear terms of the contract and NTC's misunderstanding of those terms.

## IV. CONCLUSION

The contract did not prevent the Engineer from directing NTC to reuse the removed surcharge in the runway embankment, and NTC should have anticipated that it would have to do so, and that it would not be paid at borrow embankment rates when doing so. The contract cannot reasonably be interpreted to allow a contractor to waste removed surcharge before completion of other work, notably the runway embankment, for which the surcharge borrow material was suitable. We AFFIRM the superior court order affirming the administrative decision denying NTC's claim.

MOORE, C.J., not participating.