UNIVERSITY OF ALASKA, Appellant,

v.

UNIVERSITY OF ALASKA CLASSIFIED EMPLOYEES ASSOCIATION, Alaska Public Employees Association/AFT AFL–CIO, Appellees.

No. S–7801.

Supreme Court of Alaska.

Feb. 6, 1998.

Thomas P. Owens, Jr., and Kimberly K. Geariety, Owens & Turner, P.C., Anchorage, for Appellant.

James A. Gasper, Jermain, Dunnagan & Owens, P.C., Anchorage, for Appellees.

Before MATTHEWS, C.J., and COMPTON, EASTAUGH and BRYNER, JJ.

## OPINION

EASTAUGH, Justice.

### I. *INTRODUCTION*

The question presented here is whether the University of Alaska Classified Employees Association (Union) waived its right to collectively bargain a restrictive smoking policy adopted by the University of Alaska Fairbanks (UAF). When the Union filed an unfair labor practice complaint asserting that the smoking policy was a mandatory subject of collective bargaining, the Alaska Labor Relations Agency (ALRA) concluded that the union had contractually waived bargaining on the subject. The superior court held that there was no waiver. We conclude that the union waived any right to bargain on the smoking policy and reverse the decision of the superior court.

### II. *FACTS AND PROCEEDINGS*

#### A. *The Smoking Policy*

In November 1988 the University Board of Regents adopted the following smoking policy:

In order to protect university students, employees and visitors from the hazards associated with secondary smoke, smoking shall be prohibited in all university facilities open to the public, except that reason

able smoking areas may be designated by the cognizant Chancellor or his/her designee in accordance with AS 18.35.320 unless such designation is prohibited for the protection of the public safety or the protection and preservation of the building and its contents.

Regents' Policy 06.02.03 (Nov. 17, 1988);[1] *see* AS 18.35.320.[2]

In accordance with this policy, UAF prohibited smoking in most buildings and designated a limited number of inside smoking areas.[3] In May 1993, after receiving student, faculty, and staff comments, the Chancellor prohibited smoking effective July 10, 1993, in all non-residential buildings and motor vehicles owned, leased, or operated by the University.[4]

In December 1994 the University Board of Regents adopted a revised smoking policy providing that "[s]moking shall be prohibited in all non-residential university facilities open to the public and all public areas of all residential university facilities." *See* Regents' Policy 05.12.04 (Dec. 8, 1994).

#### B. *The Union Negotiations*

In 1993 the ALRA certified the Union as the exclusive bargaining representative for University of Alaska employees who perform various trade, maintenance, and custodial functions. The bargaining unit represented by the Union consists of over 200 employees throughout the University system, about 140 of whom work at UAF.

On May 13, 1993, the Union formally requested bargaining and asked that the University not change the employees' wages, hours, and other terms and conditions of

---

1. In 1984 certain areas on University property were designated non-smoking areas. Prior to 1984, students could smoke in the classroom with the consent of the instructor, and smoking by employees was not regulated.

2. AS 18.35.300 declares smoking "a nuisance and a public health hazard" and prohibits it in a "public ... postsecondary educational institution." AS 18.35.300(3). A person in charge of an indoor place, however, may designate an indoor smoking section making "reasonable ac-

commodations to protect the health of the non-smokers who use the place." AS 18.35.320.

3. In 1989 both the University of Alaska Southeast and the University of Alaska Anchorage prohibited smoking in all University buildings.

4. This revised policy prohibited smoking in eight previously designated smoking areas in campus buildings. It did not prevent smoking in residential apartments, houses, or rooms in dormitories.

employment. The University began negotiating with the Union in September 1993.

Gary Seaman, a Union member at UAF, had learned of the revised smoking policy that became effective in July 1993, but had continued to smoke in the vehicle assigned to him. In January 1994 he was censured at work for smoking in the vehicle·and subsequently authored a petition signed by thirty Union members asking the Union to negotiate the July 1993 smoking policy.

On February 3, 1994, during collective bargaining negotiations, the Union asked to negotiate the UAF smoking policy. The University refused to bargain, claiming that because the smoking policy was a permissive subject, there was no obligation to bargain.

The Union and UAF reached a tentative collective bargaining agreement (CBA) in January 1995; the Union's members ratified it shortly thereafter. The agreement provided that the University would retain all managerial rights not modified by the agreement. The agreement also provided that bargaining unit members would follow the policies not specifically superseded by the agreement, and reserved to the Board of Regents the right to change University policy. Additionally, the agreement contained a "zipper clause," which provided:

> This Agreement is the entire Agreement between the Employer and the Union. The parties acknowledge that during the negotiations which resulted in this Agreement, each fully bargained with respect to terms and conditions of employment and have settled them for the duration of this Agreement. This Agreement terminates all prior understandings and supersedes any contrary or inconsistent rules, regulations, past practices, or institutional work practices and concludes all collective bargaining for the duration of this Agreement.

**5.** AS 23.40.110(a)(5) provides:

> A public employer or an agent of a public employer ·may not refuse to bargain collectively in good faith with an organization which is the exclusive representative of employees in an appropriate unit, including but not limited to the discussing of grievances with the exclusive representative.

### C. The Proceedings

On May 17, 1994, the Union filed an unfair labor practice charge against the University asserting that smoking policies are a mandatory subject of bargaining and that the University could not refuse to bargain under AS 23.40.110(a)(5).[5] The University argued that smoking policies are a permissive subject of bargaining and that the Union had waived its right to bargain on the smoking policies.

In April 1995 the ALRA concluded that the University's smoking policy was a mandatory subject of bargaining and that the Union had not waived its right to bargain by inaction after receiving notice of the pending smoking policy. The ALRA, however, ruled that the Union had contractually waived bargaining on the smoking policy and found that the University had not violated AS 23.40.110(a)(5).

The Union appealed the ALRA's decision to the superior court. The University responded and cross-appealed.

The superior court affirmed' the ALRA's rulings that the smoking policy was a mandatory subject of bargaining and that the Union did not waive its right to bargain by failing to submit its request for bargaining earlier. The superior court, however, reversed the ALRA's decision that the Union, by executing the CBA, had waived its right to bargain.

The University appeals all rulings of the superior court.

### III. DISCUSSION

*Did the Union Waive Its Right to Bargain on the Smoking Policy?*

 The University argues that the superior court erred in reversing the ALRA's determination that the Union expressly waived 'bargaining on the smoking policy.[6]

**6.** We independently review the merits of an administrative determination. *Handley v. State, Dep't of Revenue,* 838 P.2d 1231, 1233 (Alaska 1992). No deference is given to the superior court's decision when that court acts as an intermediate court of appeal. *Id.*

The determination of whether by entering into the CBA the Union contractually waived its right to bargain involves interpretation of the CBA,

It argues that the Union waived its right to bargain when it entered into the CBA because the CBA contained (1) a promise to follow Board of Regents' policies not specifically superseded by the agreement, and (2) a "zipper" clause stating that the agreement was the complete agreement. The University cites National Labor Relations Board (NLRB) and labor arbitration precedent in support of its claim that the Union expressly waived its right to bargain.

Citing a NLRB standard of whether the Union "consciously yielded" its position, the University argues that the Union waived bargaining on the smoking policy because it knew of the Board of Regents' smoking policy when it agreed to abide by the Board of Regents' policies and regulations in Section 1.8 of the agreement. The University argues that the rule of construction known as *expressio unius est exclusio alterius* (the expression of one thing implies the exclusion of others) supports this conclusion.

The Union argues that it is "legally impossible for a party to waive a right which is proposed for negotiation, but is never actually negotiated because of the other party's refusal." The Union claims that the agreement that was accepted did not reveal any Union intent to waive its rights regarding the smoking policy. The Union also argues that the content of the CBA is irrelevant because the University had already committed an unfair labor practice by not bargaining on a mandatory subject. It also asserts that proceeding with the unfair labor practice charge is evidence that the Union did not waive its right to bargain.

The Union factually distinguishes NLRB precedent cited by the University and asserts that labor arbitration cases are unpersuasive

on this issue because the ALRA cannot consult them as precedent and because arbitration is informal.

■ As a general rule, a waiver of a bargaining subject by express agreement must be in clear and unmistakable language. *See, e.g., Metropolitan Edison Co. v. NLRB,* 460 U.S. 693, 708, 103 S.Ct. 1467, 1477, 75 L.Ed.2d 387 (1983); *Chicago Tribune Co. v. NLRB,* 974 F.2d 933, 936–37 (7th Cir.1992) (questioning the meaning of the "clear and unmistakable principle"); *Juneau Educ. Ass'n v. City of Juneau,* 539 P.2d 704, 707 (Alaska 1975) (finding clear and unmistakable modification of bargaining agreement); *see generally* 1 Patrick Hardin, *The Developing Labor Law,* 699–705 (3d ed.1992).

In analyzing an alleged waiver, the NLRB examines "all surrounding circumstances including but not limited to bargaining history, the actual contract language, and the completeness of the collective-bargaining agreement." *Resthaven Corp.,* 322 N.L.R.B. No. 128, 1997–1998 NLRB Dec. (CCH) ¶ 16,203 (Dec. 23, 1996) (finding that union had not waived its rights under a management-rights clause); *Allied–Signal, Inc.,* 307 N.L.R.B. 752 (1992) (ruling that union had waived its rights to bargain smoking policy under CBA containing a safety and health clause and a zipper clause); *TCI of New York, Inc.,* 301 N.L.R.B. 822 (1991) (finding that union had waived its rights to bargain under CBA).

Some federal appellate courts have followed the NLRB and have found that a CBA is not governed by the same principles of interpretation applicable to private contracts. *See, e.g., Operating Eng'rs Pension Trusts v. B & E Backhoe, Inc.,* 911 F.2d 1347, 1352 (9th Cir.1990). Other courts have heavily relied on the principles of contract law. *See,*

<hr>

and therefore a question of law. *Northern Timber Corp. v. State, Dep't of Transp. & Pub. Facilities,* 927 P.2d 1281, 1284 n. 10 (Alaska 1996). Where it appears that the agency has invoked its expertise in deciding questions of law, we review the agency's decision applying the rational basis standard. *Id.* Under this standard, we defer to the agency determination as long as it is supported by the facts and has a reasonable basis in law. *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.,* 746 P.2d 896, 903 (Alaska 1987). Where it appears that the agency has not invoked its expertise, we apply the substitution of judg-

ment standard and review questions of law independently. *Northern Timber Corp.,* 927 P.2d at 1284 n. 10. However, "where 'interpretation of a written instrument turns on the acceptance of extrinsic evidence, the process of weighing such evidence should be for the trier of fact.' " *Southwest Marine, Inc. v. State, Dep't of Transp. & Pub. Facilities,* 941 P.2d 166, 172 (Alaska 1997) (quoting *Alyeska Pipeline Serv. Co. v. O'Kelley,* 645 P.2d 767, 771 n. 2 (Alaska 1982)). We review the agency's findings of fact under the substantial evidence standard. *Id.*

*e.g., Chicago Tribune Co.,* 974 F.2d at 937 (ruling that where the contract defines the parties' rights as to mandatory subjects of bargaining, the contract will control); *Local Union No. 47, Int'l Bhd. Of Elec. Workers v. NLRB,* 927 F.2d 635, 641 (D.C.Cir.1991) (same).

In analyzing an alleged waiver in a CBA, we follow NLRB precedent. Neither party has argued that we should strictly limit our analysis to contract law.

The CBA, dated January 20, 1995, contains three sections that arguably affect the Union's right to bargain the smoking policy. Section 1.8, entitled "University Policy and Regulation," states that "[u]nless superseded by a specific provision of this Agreement, the Board of Regents Policy and Regulations, as amended from time to time, shall apply to all Bargaining Unit Members without any obligation to bargain over such changes." On December 3, 1994, the Board of Regents adopted a no-smoking policy in "all non-residential university facilities open to the public." Because the agreement contains no "specific provision" superseding this no-smoking policy, the December 3, 1994 policy appears to apply to bargaining unit members.[7]

The agreement also contains a management-rights section, in which the University retains managerial prerogatives "to issue, amend and revise policies, rules, regulations, and practices," and the zipper clause, which states that "[t]his Agreement is the entire Agreement between the Employer and the Union." The zipper clause also specifies procedures the University is to use when enacting a change in any mandatory subject of bargaining.

The parties' bargaining history is also relevant. The negotiations lasted approximately eighteen months. Although the Union was newly certified, the Union was represented by an experienced labor negotiator, Bruce Ludwig, who had negotiated several hundred labor agreements. Ludwig testified that the parties agreed to Section 1.8 during the course of mediation with a federal mediator. Ludwig either knew or reasonably should have known of the Board of Regents' policies and regulations before agreeing that they will apply to the bargaining unit members unless specifically superseded by the agreement.[8]

In holding that the Union had waived its right to bargain the smoking policy, the ALRA determined that the Union had contractually waived its rights by agreeing in Section 1.8 to follow the Board of Regents' policies and regulations. The clear and unmistakable language in Section 1.8, bolstered by the bargaining history, supports this determination.

Although the Board of Regents did not explicitly prohibit smoking in vehicles, UAF Chancellor Wadlow explicitly prohibited smoking in University vehicles, and thus the Union could be deemed to have waived its right to bargain on this subissue by agreeing to the management-rights section. Resolving a question whether a management-rights section waives bargaining on a particular topic is highly fact specific, and other cases finding that there was no waiver are factually distinguishable. *See NLRB v. Katz,* 369 U.S. 736, 742–43, 82 S.Ct. 1107, 1111, 8 L.Ed.2d 230 (1962) (employer violated its duty to bargain collectively); *Klein Tools, Inc.,* 319 N.L.R.B. 674 (1995) (union did not waive smoking policy changes by accepting man-

---

7. Although this policy does not prohibit smoking in University vehicles, the Regents have the power under the agreement to change policies which Union members must follow unless they are specifically superseded by the agreement. Also, as discussed *infra* at pages 1186–1187, management, which did issue the smoking policy for University vehicles, also has the right to issue policies under the agreement.

8. There is evidence that Ludwig specifically knew of the changes in the smoking policy. The ALRA found that:

[Union] chief negotiator Bruce Ludwig was aware of the smoking rules in September of 1993 during negotiations.... Ludwig was not aware, however, that there had been any changes to the smoking rules. The changes were first brought to his attention by [Union] member Gary Seaman.... Seaman authored a petition dated January 30, 1994, signed by 30 members of the [Union] unit asking the [Union] negotiating team to negotiate the smoking ban of July 10, 1993.

Substantial evidence supports this finding.

agement-rights clause partly because employer delayed in advancing its waiver argument). The ALRA's decision is supported by NLRB and federal circuit precedent. In *Allied–Signal*, the NLRB relied on a safety and health clause in the CBA and the bargaining history of the parties in finding that the union had waived its right to bargain changes in the smoking policy. 307 N.L.R.B. 752. In *Chicago Tribune Co.*, the Seventh Circuit found that the management rights clause in the parties' CBA permitted the employer to unilaterally impose an alcohol and drug standard on employees because the new standard was a regulation relating to employee conduct. 974 F.2d at 936–37.

Here, the Union agreed to Section 1.8, the management-rights section, and the other parts of the agreement as the "entire Agreement between the Employer and the Union." The Union took the proposal seriously and accepted the section after mediation. Considering the language and bargaining history of the contract, we conclude that the Union contractually waived its right to bargain the smoking policy. We therefore affirm ALRA's ruling that the union waived bargaining on the smoking policy by accepting the CBA.[9]

## IV. CONCLUSION

For these reasons, we REVERSE the decision of the superior court with instructions to affirm the decision of the ALRA which concluded that the Union waived bargaining on the University of Alaska smoking policy. The ALRA consequently did not err in dismissing the unfair labor practice complaint under AS 23.40.110(a)(5).

FABE, J., not participating.

---

**9.** The University also argues that (1) the smoking policy is not a mandatory subject for bargaining, but is instead a permissive subject which the University is not required to negotiate, and (2) the Union waived its right to bargain when it failed to make a timely request for bargaining. Both the ALRA and the superior court concluded that the smoking policy is a mandatory subject of negotiation and that the Union did not waive its right to bargain by failing to submit its request earlier.

We decline to decide these issues because our holding that the Union expressly waived bargaining renders these issues moot.