**AMERADA HESS PIPELINE CORPORATION, et al., Petitioners,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**MAPCO Alaska Petroleum Inc., et al., Intervenors.**

**Nos. 95–1305, 96–1153 and 96–1267.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 31, 1997.

Decided July 8, 1997.

Rehearing Denied Sept. 15, 1997.

---

Steven Reed and Eugene R. Elrod, Washington, DC, argued the cause, for petitioners TAPS Carriers, with whom Steven H. Brose, Washington, DC, Albert S. Tabor, Jr., Houston, TX, and John E. Kennedy were on the joint briefs. Dean H. Lefler, Houston, TX, entered an appearance.

Samuel Soopper, Attorney, Federal Energy Regulatory Commission, Mount Rainier, MD, argued the cause, for respondent, with whom Jerome M. Feit, Washington, DC, Solicitor at the time the brief was filed, Joseph S. Davies, Deputy Solicitor, Bethesda, MD, Joel I. Klein, Acting Assistant Attorney General, United States Department of Justice, Washington, DC, John J. Powers, III, Washington, DC and Robert J. Wiggers, Attorneys, were on the brief. Janet K. Jones, Attorney, Federal Energy Regulatory Commission, entered an appearance.

Robert H. Loeffler, Washington, DC, argued the cause, for intervenor State of Alaska, with whom Jonathan Band, Bryan A. Schwartz, Bradley S. Lui, Washington, DC

and John P. Griffin were on the brief. David S. Berman, James C. Reed, Jeffrey G. DiSciullo, Washington, DC, Robert H. Benna, Washington, DC and Randolph L. Jones, Jr., entered appearances.

Before WILLIAMS, SENTELLE, and ROGERS, Circuit Judges.

SENTELLE, Circuit Judge:

A group of oil pipeline carriers petitions for review of a decision of the Federal Energy Regulatory Commission ("FERC" or the "Commission"). The decision rejected a filing by the carriers seeking a rate increase because of the inclusion of litigation and settlement costs in the carriers' tariffs. Tariff rates for the carriers are governed by a settlement agreement between the carriers and the State of Alaska. FERC determined that litigation and settlement costs incurred by the carriers in connection with the Exxon Valdez oil spill were "extraordinary expenses" within the meaning of the settlement agreement, and determined that the terms of the settlement prohibited recovery of "extraordinary expenses" as part of the carrier's tariffs. We defer to the Commission's determination as to the extraordinary nature of the litigation and settlement costs and as to the meaning of the settlement agreement. Accordingly, the petitions for review are denied.

I.

In March of 1989, the Exxon Valdez oil tanker ran aground in Prince William Sound, Alaska, spilling almost eleven million gallons of petroleum into the waters of the Sound. Pursuant to federal and state right-of-way agreements, Alyeska Pipeline Service Company ("Alyeska") assumed initial responsibility for clean-up of the spill. Alyeska operates the Trans Alaska Pipeline System ("TAPS"), a petroleum pipeline that runs from Prudhoe Bay to Valdez, Alaska. Alyeska is jointly owned by the petitioners, otherwise known as the TAPS Carriers, who also jointly own TAPS. Although Exxon reimbursed Alyeska for costs associated with the clean-up, Alyeska incurred additional costs settling claims against it related to the spill. Under the

terms of the settlement, Alyeska paid $98 million to private parties. Alyeska's litigation costs totaled approximately $19 million. Each of the TAPS Carriers paid a proportional share of the settlement and, in December 1993, filed tariff rates that included the litigation and settlement costs. Because the tariff increase would reduce the amount of money the State of Alaska earns in royalties and taxes, the State filed a protest to the TAPS Carriers' new tariffs. The State argued that the litigation and settlement costs were not properly included in the Carriers' rates. Tariff rates for the Carriers are set pursuant to a formula laid out in the TAPS Settlement Agreement, a 1985 agreement between the State of Alaska and the TAPS Carriers which was approved by FERC. *Trans Alaska Pipeline Sys.*, 33 F.E.R.C. ¶ 61,064 (1985); *Trans Alaska Pipeline Sys.*, 35 F.E.R.C. ¶ 61,425 (1986). The Settlement Agreement provides that the "maximum interstate tariff shall be calculated by dividing the relevant portion of the Total Revenue Requirement for a year by the net deliveries of petroleum projected for that particular type of transportation for that year." The State challenged the Carriers' definition of one component of the Total Revenue Requirement, "Operating Expenses."

"Operating Expenses" are defined by Section II–3 of the TAPS Settlement Agreement to be "those expenses includable in Account 610." References in the Settlement Agreement to specific accounts, such as Account 610, are to the FERC Uniform System of Accounts ("USOA") applicable to oil pipelines, 18 C.F.R. pt. 352 (1996). The USOA states that Account 610 is the omnibus account for "Operating expenses." *Id.* (Income Accounts). The State argued that the litigation and settlement costs should have been recorded under Account 680, which is used for "Extraordinary items." *Id.* Extraordinary items are those "characterized by both their unusual nature and infrequent occurrence taking into account the environment in which the firm operates; they must also meet the materiality standard." *Id.* (General Instruction 1–6(a)).

In April 1995, the Commission agreed and determined that litigation and settlement costs related to the Exxon Valdez were unusual, infrequent, and material, and so were properly recorded in Account 680. The Commission then held in March 1996 that the TAPS Settlement Agreement does not permit recovery of Account 680 expenses in the Carriers' tariffs. This petition, which challenges both the April 1995 and the March 1996 orders, followed.

## II.

We consider first the issue raised by the April 1995 order, that is, whether the litigation and settlement expenses were properly recorded in Account 680. As a preliminary matter, we must determine the appropriate standard of review of the Commission's interpretation of the USOA. Ordinarily, an agency's interpretation of its own regulations is entitled to considerable deference. *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Bluestone Energy Design, Inc. v. FERC*, 74 F.3d 1288, 1292 (D.C.Cir.1996). We give effect to the agency's interpretation "so long as it is 'reasonable.'" *Martin v. OSHRC*, 499 U.S. 144, 150, 111 S.Ct. 1171, 1176, 113 L.Ed.2d 117 (1991) (quoting *Ehlert v. United States*, 402 U.S. 99, 91 S.Ct. 1319, 28 L.Ed.2d 625 (1971)). The Carriers argue that deference is not appropriate in this case because the USOA regulations were promulgated by the Interstate Commerce Commission ("ICC") before the ICC's authority over oil pipelines was transferred to FERC. The Carriers assert that because FERC did not promulgate the accounting regulations, it has no special expertise to bring to bear on the question.

We generally do not accord deference to an agency's interpretation of regulations promulgated by another agency that retains authority to administer the regulations. *See United States Dept. of the Air Force v. FLRA*, 952 F.2d 446, 450 (D.C.Cir. 1991); *National Treasury Employees Union v. FLRA*, 848 F.2d 1273, 1275 (D.C.Cir.1988). In this case, however, jurisdiction over oil pipelines was transferred from the ICC to FERC by the Department of Energy Organization Act ("DOE Act"), Pub.L. No. 95–91, § 402(b), 91 Stat. 565, 584 (1977), codified at

42 U.S.C. § 7172(b) (1988) (repealed 1994), recodified as amended at 49 U.S.C. § 60502 (1996), and Exec. Order No. 12,009, 42 Fed. Reg. 46,267 (1977). The DOE Act provides that rules and regulations relating to functions transferred to FERC would remain in effect until modified by FERC. FERC subsequently ordered that rules and regulations relating to its jurisdiction over oil pipelines would remain in effect until modified. 42 Fed.Reg. 55,450. FERC, therefore, adopted the rules and regulations of the ICC and stands in precisely the same position as the predecessor agency with regard to the transferred functions. There is no danger that the Court will be presented with a conflicting interpretation by the promulgating agency. Moreover, we reject the argument that FERC does not have an expertise in the area merely because it did not promulgate the regulations; FERC is entrusted with administering the regulations relating to oil pipelines and has an expertise in the field based on that jurisdiction. We note also that deference is not accorded to agency interpretations merely because they possess a special expertise. Courts defer to agency interpretations in large part because Congress has chosen to delegate to the agency decision-making in the field. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 865–66, 104 S.Ct. 2778, 2792–93, 81 L.Ed.2d 694 (1984). We therefore regard FERC's interpretation of the regulations with the same level of deference accorded to the ICC prior to the transfer of authority.

■ The Carriers also argue that deference to FERC is not appropriate because the USOA General Instructions are modeled after, and virtually identical to, the accounting standards enunciated in Accounting Principles Board Opinion No. 30 (APB–30). The General Instructions specifically state that Carriers "may refer to generally accepted accounting principles." 18 C.F.R. pt. 352 (General Instruction 1–6, Note). Generally accepted accounting principles, or "GAAP," are standards adopted by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants. The Commission acknowledges that "[t]he USOA relies to some extent on ... (GAAP), which may provide" interpretive guidance to the Commission's accounting regulations. The Carriers argue that FERC is not entitled to deference because the USOA has, in essence, subordinated its own policymaking function to a professional organization.

■ We do not agree that FERC surrendered its responsibility for adopting accounting principles simply because it acted in conformity with standards endorsed by a leading professional organization. Although our deference to agency decisions is not based solely on the agency's expertise in the field, an agency's familiarity with the issues may lead it to adopt principles promulgated by an independent organization. In this sense, this case is analogous to one in which a district court has adopted factual findings· proposed by one of the litigants. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 571–73, 105 S.Ct. 1504, 1510–11, 84 L.Ed.2d 518 (1985) (holding that findings of fact are reviewed for clear error even when they were solicited from the prevailing party). In fact, it would be anomalous if an agency were to receive deference when it invented standards out of whole cloth but not when its expertise led it to standards endorsed by experts in the field. As a result we have previously cited the Commission's reliance on well-established accounting principles as grounds for upholding the Commission's accounting determinations. *CNG Transmission Corp. v. FERC*, 40 F.3d 1289, 1295 (D.C.Cir.1994). When an agency has acted in conformity with principles endorsed by experts in the field we review the case, as always, under settled principles of deference to agency action.

■ Having determined that FERC is entitled to deference in its interpretation of the USOA, we turn to whether FERC reasonably determined to treat the litigation and settlement costs as extraordinary items. The regulations define "extraordinary" in terms of the relevant "event or transaction." *See* 18 C.F.R. pt. 352 (General Instruction 1–6(a)). Similarly, the APB–30 definition of extraordinary refers to the "underlying event or transaction." In identifying the relevant event or transaction in this case, the Court is presented with two alternatives. The Carriers argue that the accounting event or trans-

action was Alyeska's response to the oil spill because it was "that response which allegedly injured the private plaintiffs, giving rise to the litigation and the [litigation and settlement] costs at issue here." The Commission determined, by contrast, that the relevant accounting event was the Exxon Valdez oil spill. The Commission stated, "While failure to adequately plan for and respond to the spill may have exacerbated the situation and its financial impact on Alyeska and the TAPS Carriers, the central, triggering event that lead to the [litigation and settlement] costs was the oil spill itself."

Deferring, as we must, to the Commission's reasonable interpretation of its own regulations, we cannot conclude that the Commission erred in treating the oil spill itself as the relevant accounting event. The record reflects testimony from numerous accounting experts who treated the oil spill as the relevant accounting event. Moreover, APB-30 refers to the "underlying" event or transaction, suggesting that it is not necessary to treat the most immediate cause of the expense as the event. As the Commission held, "the central underlying occurrence that gave rise to the costs" was the oil spill. We would find it difficult to conclude, as urged by the Carriers, that only Alyeska's response to the spill injured the plaintiffs and led to settlement because the litigation against Alyeska alleged, not just negligence in cleaning up the spill, but failure to prevent the spill, common law trespass for discharge of the oil, and using a dangerous method of transporting oil through the Sound. Whether any of these allegations were meritorious is beyond the scope of the Commission's inquiry, and beyond the reach of this Court. It is necessary only for us to decide that the Commission was reasonable in concluding that the oil spill was the relevant accounting event.

Having upheld the Commission's determination that the oil spill was the relevant event, we must determine whether FERC reasonably concluded that the spill was "extraordinary" under the standards set forth in the USOA. All items "are includable in ordinary income unless evidence clearly supports their classification as extraordinary items." 18 C.F.R. pt. 352 (General Instruction 1–6(a)). "Extraordinary items" are those "characterized by both their unusual nature and infrequent occurrence taking into account the environment in which the firm operates; they must also meet the materiality standard." *Id.* We consider first whether the Commission reasonably concluded that the oil spill was unusual and infrequent.

Borrowing language from APB–30, the General Instructions state:

> Unusual means the event or transaction must possess a high degree of abnormality and be of a type clearly unrelated to, or only incidentally related to the ordinary and typical activities of the entity.

> Infrequent occurrence means the event or transaction shall be of a type not reasonably expected to recur in the foreseeable future.

18 C.F.R. pt. 352 (General Instruction 1–6(a)). In determining whether an event is unusual and infrequent, the USOA requires the Commission to consider "the environment in which the firm operates." *Id.* With respect to both regulatory criteria, the central dispute in this case is whether the Commission could reasonably conclude that the spill was unusual and infrequent due to its size. In other words, can the magnitude of the event suggest that it is unusual and infrequent even if similar occurrences on a smaller scale are routine?

■ The Carriers argue that the size of an event is irrelevant because the General Instructions direct the carrier to look at the "type" of event. The Carriers assert that the "type" of event is an oil spill, and because oil spills are not unusual or infrequent, neither was the Exxon Valdez spill. The Commission, supporting its decision that the size of the event is relevant, cites expert testimony in the record. One expert pointed to an accounting interpretation of APB–30 that gives as an example of an extraordinary event the destruction of a tobacco manufacturer's crops by a hail storm even though weather-related crop damage is common.[1]

---

1. The Carriers argue that a dissent from APB–30     indicates that size is not relevant in determining

Given this evidence, we cannot conclude that the Commission was unreasonable in considering the enormity of the spill.

■ Because we conclude that size is relevant to the determination, we hold that the Commission's determination that the oil spill was unusual and infrequent was reasonable regardless of how the Commission defines "the environment in which the firm operates." The Exxon Valdez oil spill was the largest in United States history and was the only spill from a tanker transiting Prince William Sound in 13,089 tanker calls. Alyeska's contingency plans indicate that it considered a spill of this magnitude to be unlikely. The record shows that the vast majority of oil spills in Prince William Sound have involved less than one quarter of a barrel of oil, or 10 gallons. The Exxon Valdez, by contrast, spilled nearly 11 million gallons of oil. The two types of spills present a difference not just of degree but of kind. The Exxon Valdez spill is, as the Commission concludes, in a class by itself. Whatever the appropriate definition of Alyeska's environment, the oil spill was unusual and infrequent.

■ We turn, therefore, to the question of materiality. The General Instructions state that:

> As a general standard an item shall be considered material when it exceeds 10 percent of annual income (loss) before extraordinary items. An item may also be considered in relation to the trend of annual earnings before extraordinary items or other appropriate criteria.

18 C.F.R. pt. 352 (General Instruction 1–6(f)). The Carriers do not dispute that the litigation and settlement costs of approximately $117 million total almost 23 percent of the TAPS Carriers' net income of 1993.

They argue, however, that FERC erred in aggregating the figures of the TAPS Carriers because each Carrier keeps its own accounts and files its own tariffs. We hold that aggregation was reasonable. As the Commission discussed, the litigation and settlement costs were incurred as a single item. The TAPS Settlement Agreement provides that the amount included in specific USOA accounts is the consolidated amounts of all Carriers. Section II–2(c) of the Settlement Agreement provides, "Unless otherwise stated, the amounts included in the calculations and accounts referred to in this Agreement shall be consolidated amounts of All TAPS Carriers." We hold, therefore, that the Commission acted reasonably in determining that the litigation and settlement costs were material.

■ Having upheld the Commission's conclusions as to the unusual and infrequent nature of the spill and the materiality of the litigation and settlement costs, we conclude that the Commission reasonably held the expenses to be extraordinary items properly recorded in Account 680.

### III.

■ We are left with a remaining issue: whether the TAPS Settlement Agreement precludes recovery in the Carriers' tariffs of items recorded in Account 680. The Settlement Agreement states that Operating Expenses are recoverable and then defines Operating Expenses to be "those expenses includable in Account No. 610." The Commission interprets this language to mean that Account 680 expenses, such as the litigation and settlement costs, are not recoverable.

whether an event is unusual or infrequent. The opinion states, "Mr. Watt dissents to this Opinion because ... [he] believes that, in addition to the criteria for extraordinary items prescribed in paragraph 20, the Board should have recognized that the quality of being extraordinary can be derived from a combination of infrequency of occurrence (paragraph 20b) and abnormality of size....This view is described in paragraph 6." Paragraph six states that "other accountants" "believe that a combination of infrequency of occurrence and *abnormality of financial effect*

should also result in classifying an event or transaction as extraordinary." (Emphasis added.) In other words, the majority rejected the dissent's position that the size of the financial effect of the event combined with its infrequency is sufficient to make an event extraordinary. In this case the Commission is relying, not on the extraordinary costs associated with the Exxon Valdez, but on the *sheer magnitude of the spill*, meaning the number of gallons of petroleum. We do not read APB–30 to indicate that this factor is irrelevant.

Because "Congress explicitly delegated to FERC broad powers over rate-making, including the power to analyze relevant contracts," *Tarpon Transmission Co. v. FERC*, 860 F.2d 439, 441–42 (D.C.Cir.1988), and because the Commission has greater technical expertise in this field than does the Court, *id.* at 442, we accord deference to the Commission's interpretation of the Settlement Agreement. *See Williams Natural Gas Co. v. FERC*, 3 F.3d 1544, 1549 (D.C.Cir. 1993). "Deference, however, does not mean abdication of careful and thorough judicial review." *Baltimore Gas & Elec. Co. v. FERC*, 26 F.3d 1129, 1135 (D.C.Cir.1994). We will not accept FERC's interpretation of a contract unless it is "amply supported, both factually and legally." *Williams Natural Gas Co. v. FERC*, 90 F.3d 531, 533 (D.C.Cir. 1996) (internal quotations omitted).

Section II–2(a) of the TAPS Settlement Agreement states that the maximum interstate tariff is calculated by dividing the Total Revenue Requirement by the net deliveries of petroleum for that type of transportation for that year. The Total Revenue Requirement is the sum of: (1) Operating Expenses; (2) DR&R Allowances; (3) Depreciation; (4) Recovery of Deferred Return; (5) After–Tax Margin; and (6) Income Tax Allowance; with the following elements subtracted: (7) Non–Transportation Revenues; and (8) Net Carryover, if any. Section II–3 of the Settlement Agreement defines Operating Expenses as "those expenses includable in Account No. 610." Although the litigation and settlement costs are not, as we discussed, properly included in Account 610, the Carriers argue that the Settlement Agreement does not, either expressly or by implication, require that operating expenses be excluded from the Carriers' rates, simply because they ultimately do not belong in Account 610. The Carriers argue that under the USOA all operating expenses are initially "includable in Account No. 610" because no item can be placed in Account 680 without Commission approval. *See* 18 C.F.R. pt. 352 (General Instruction 1–6(g)). The Carriers assert that Account 680 expenses are initially included in Account 610 then "reclassified" to Account No. 680.

In support of their interpretation, the Carriers cite evidence extrinsic to the language of the Settlement Agreement. On appeal, the Commission argues that this evidence was properly excluded because extrinsic evidence is not admissible without a prior finding that the contractual language is ambiguous. In interpreting a federal contract, we have held that where a contract is "clear and unambiguous on its face, a court will assume that the meaning ordinarily ascribed to th[e] words reflects the intentions of the parties" and that we will not "look to extrinsic evidence of intent to guide the interpretive process." *NRM Corp. v. Hercules Inc.*, 758 F.2d 676, 681–82 (D.C.Cir.1985). The parties are in dispute, however, about whether federal law or Alaskan law governs interpretation of the Settlement Agreement. Section III–6 of the Agreement states, "This Agreement shall be governed by, and construed in accordance with, federal law to the extent applicable and otherwise by the law of the State of Alaska." The Commission and the State argue that, under both bodies of law, extrinsic evidence is inadmissable unless there is a contractual ambiguity. The Commission argues that there is no such ambiguity in the TAPS Settlement Agreement.

We note, without deciding, that Alaska law does not appear to be so clear as the Commission contends. The State, as intervenor, argues that Alaska law permits, but does not require, the consideration of extrinsic evidence even without a prior finding of ambiguity. *See Klosterman v. Hickel Inv. Co.*, 821 P.2d 118, 124 (Alaska 1991) ("Where a contract provision is unambiguous, we will ascertain the parties' intention from the instrument itself."). Most recently, the Alaska Supreme Court has described its approach to contract interpretation somewhat differently. In *Neal & Co. v. Association of Village Council Presidents Reg'l Hous. Auth.*, 895 P.2d 497 (Alaska 1995), the Court stated,

> The goal in interpreting any contract is to give effect to the reasonable expectations of the parties.... The parties' expectations must be gleaned not only from the contract language, but also from extrinsic evidence, including the parties' conduct, goals sought to be accomplished, and sur-

**605**

rounding circumstances at the time the contract was negotiated.

*Id.* at 502 (internal quotations and citations omitted); *see also Ashley v. Baker,* 867 P.2d 792, 794 n. 1 (Alaska 1994) ("[T]he court must look first to the written agreement itself and also to extrinsic evidence regarding the parties' intent at the time the contract was made." (internal quotations omitted)); *Keffer v. Keffer,* 852 P.2d 394, 397 (Alaska 1993) ("The goal in interpreting a contract is to give effect to the reasonable expectations of the parties. These expectations are determined by reviewing the language of any disputed provision, other provisions, relevant extrinsic evidence, and case law interpreting similar provisions."); *Fairbanks North Star Borough v. Tundra Tours, Inc.,* 719 P.2d 1020, 1024 n. 6 (Alaska 1986) ("[T]his court ... has moved away from the cumbersome two-step process of evaluating extrinsic evidence only after a preliminary finding of ambiguity.").

▮ In this case resolution of the issue of Alaska law is unnecessary because in its decision the Commission relied on another principle, one that is indisputably part of both Alaska and federal law. In the challenged orders the Commission held that the language of the Settlement Agreement was unambiguous, but excluded the extrinsic evidence for a separate reason, that the evidence went to "the subjective intent" of the parties rather than their "mutual intent ... at the time of the negotiations." Under both Alaska and federal law, extrinsic evidence as to one party's subjective intent is not admissible. *See Peterson v. Wirum,* 625 P.2d 866, 870 (Alaska 1981) ("Differences of opinion among the parties as to their subjective intent, expressed during the litigation ... are not considered to be probative."); *Conoco Inc. v. United States,* 35 Fed. Cl. 309, 325 (1996) ("However, contract interpretation, with or without extrinsic evidence, may never be used to discern the unilateral subjective intent of one or more of the parties."). The Commission relied on this rule of contract interpretation in declining to credit "a substantial portion" of the proffered evidence. Then, despite its determination that the language of the contract was unambiguous, the Commission agreed to consider evidence as

to the "commercial and regulatory" context of the Agreement. With regard to this evidence, the Commission determined that "nothing in the overall economic circumstances of the Settlement negates [the] clear language" of the Agreement. The Commission found it "unnecessary to address the choice of law issue ... because our rulings on the testimony submitted by the TAPS Carriers are appropriate under any standard of contract interpretation."·

▮ It is a cardinal rule of administrative law that a reviewing court may not affirm an agency decision on the basis of a rationale the agency itself did not adopt. *See SEC v. Chenery Corp.,* 318 U.S. 80, 88, 63 S.Ct. 454, 459–60, 87 L.Ed. 626 (1943). We turn, therefore, to the basis upon which the Commission rested its order, that is, that the extrinsic evidence proffered by the Carriers was not probative because it did not go to the mutual intent of the parties at the time of negotiations.

▮ The Carriers claim that the Commission failed to engage in reasoned decision-making by not responding to several pieces of evidence offered into the record. First, the Carriers cite the testimony of Kenneth A. Baden, one of the drafters of the Settlement Agreement. Mr. Baden testified that at the time of drafting he understood that the Carriers would be permitted to recover all operating expenses so long as they were not imprudent or unlawful. He stated, "[A]s far as I was concerned, the reference to Account 610 was simply intended to denote operating expenses as opposed to other types of expenses (such as capital costs, for example)....[T]o my knowledge, there had never been up to that time any instance of an operating expenses amount recorded in Account 610 by an oil pipeline carrier being reclassified by the Commission as an extraordinary item in Account 680....[I]f any such intent had been expressly stated, I would have had grave reservation about the wisdom of entering into any such agreement."

▮ For the most part, the statements of Baden are, as the Commission determined, no more than evidence of his subjective in-

tent. They go to his personal understanding of the contractual terms rather than its objective meaning. The Carriers cite only one statement by Baden that could be construed as extrinsic evidence of the objective meaning of the contract. Baden stated, "no one familiar with oil pipeline accounting and regulation had any reason to anticipate as of December 31, 1984 that Account 680 would be applied to reclassify an operating expense item that was initially recorded in Account 610." The Commission responded to this argument separately to say, "Contrary to the TAPS Carriers' assertion, all expenses are not initially classified to Account No. 610. Expenses meeting the requirements for inclusion in Account [No. 680] at the time they are incurred should be recorded directly into those accounts at that time." In other words, even if Baden's testimony is probative of the objective meaning of the contract, the Commission considered the argument and determined that it relied on erroneous assumptions. We hold that the Commission's response to Baden's testimony was reasoned and adequate.

█ Next, the Carriers cite an Explanatory Statement submitted, along with the Settlement Agreement, to FERC and the Alaska Public Utilities Commission. The Explanatory Statement discusses Section II–10(h) of the Settlement Agreement, known as the Net Carryover provision. The Net Carryover provision permits the Carriers to carry forward revenue excesses or deficits from prior years limited to a negative carryover of 20 percent of the Total Revenue Requirement in any one year. The Explanatory Statement states that such a "true-up" mechanism is necessary if the tariffs are to be considered "full cost-of-service tariffs." The Commission acknowledged this argument below and stated, "We find nothing in the net carryover provision that expresses or implies an intent to allow rate recovery of extraordinary items." The Commission credited the staff's argument that the Carriers had "confuse[d] costs that may be recovered in the TAPS Carriers' rates with the method allowed for recovering these costs.... Net Carryovers are calculated ... by determining if revenues were received for a given year were less than the Total Revenue Re-

quirement for that year. Because Account No. 680 expenses are not operating expenses ... they are excluded from ... the calculation for Net Carryover." In other words, the Net Carryover is provided so that Carriers can "true-up" the components within the Total Revenue Requirement, meaning Account 610 but not Account 680 expenses.

We hold that this explanation satisfies the requirement that the Commission engage in reasoned decisionmaking and is amply supported. Although the Commission did not respond directly to the argument that the words "full cost-of-service tariff" imply recoverability of Account 680 expenses, the Commission did articulate its understanding that the Net Carryover provision did not apply to Account 680 expenses. Read in context, therefore, the Explanatory Statement means that the Settlement Agreement intended to allow "true-up" only of the expenses included within the Total Revenue Requirement.

· █ The Carriers also cite statements made at a 1987 hearing before the Alaska Public Utilities Commission on the intrastate TAPS Settlement Agreement, which uses the same mechanism as the interstate TAPS Settlement Agreement for determining the tariffs. Thomas Horst, who represented Alaska in the Settlement Agreement negotiations stated, "Operating Expense generally allows the TAPS Carriers to recover their current out-of-pocket costs of operating and maintaining the TAPS." Horst also stated,

All operating expenses incurred either through Alyeska or directly by the TAPS owners, all operating expenses go into the calculation of total operating expenses, which in turn are reflected in the revenue requirement. There's nothing, no costs relating to TAPS that are isolated or set aside in calculating the total revenue requirement.

Dr. Jerome Hass testified that the TAPS Carriers were entitled "to fully recover all of [their] operating costs."

█ The Commission was not required to respond to this testimony in its March 1996 order. As the Commission stated, it is not necessary to give weight to extrinsic evidence made during litigation and prepared long

**607**

after the contract has been negotiated. *See Peterson,* 625 P.2d at 870; *Arizona Public Service Co.,* 18 F.E.R.C. 61,197 (1982).

We conclude, therefore, that the Commission was not required to say more than it did with regard to the extrinsic evidence offered by the Carriers. We uphold the Commission's decisions regarding the classification of the litigation and settlement expenses under Account 680 and the nonrecoverability of the expenses in the Carriers' tariffs. For the foregoing reasons we deny the petitions for review.

*So ordered.*